REVISED April 15, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 14, 2009

Charles R. Fulbruge III
Clerk

No. 08-30201

MARK HENRY

Plaintiff-Appellee

v.

LAKE CHARLES AMERICAN PRESS LLC; LAKE CHARLES AMERICAN PRESS INC; SHEARMAN CO LLC; SHEARMAN CORP; HECTOR SAN MIGUEL

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before SMITH, BARKSDALE, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

In the forty-five years since the Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), courts and legislatures have endeavored to strike a balance between individuals' interests in their reputation and the public interest in free and robust debate. The resulting interplay of defamation law and the First Amendment has substantially lessened the chilling effect of abusive tort claims for conduct stemming from the exercise of First Amendment rights. While these efforts have shielded individuals from the chill

of liability, they have often failed to protect speakers from the similarly-chilling cost and burden of defending such tort claims. Concerned over the growth of meritless lawsuits that have the purpose or effect of chilling the exercise of First Amendment rights, a number of state legislatures have created a novel method for better striking the balance between interests in individual reputation and freedom of speech.

This appeal addresses one such method, specifically, Article 971 of Louisiana's Code of Civil Procedure. Article 971 provides a mechanism whereby a plaintiff bringing a defamation claim must show a probability of success on the merits before proceeding. Defendants-Appellants consist of four entities—Lake Charles American Press, L.L.C.; Lake Charles American Press, Inc.; Shearman Co. L.L.C.; and Shearman Corp.—as well as the author of the majority of the newspaper articles in question—Hector San Miguel (collectively "American Press"). American Press brought an Article 971 motion in response to Plaintiff-Appellee Mark Henry's ("Henry") defamation suit. Henry, owner of an airport refueling operation, asserts that American Press defamed him by reporting that Henry provided military aircraft with contaminated fuel that caused their engines to fail, or "flame out."

The district court denied American Press's motion, and American Press brought an immediate appeal. As a threshold matter, we hold that we have jurisdiction over this interlocutory appeal. Moreover, as Henry has failed to establish the necessary probability of success, we reverse the district court's order and render judgment dismissing Henry's defamation claim. Further, we remand the case to the district court for a determination of American Press's entitlement to fees and costs.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Henry was the owner and president of Chennault Jet Center, Inc. ("CJC") from 1995 to 2005. CJC operated out of the Chennault International Airport in

Lake Charles, Louisiana, and had contracted with the Defense Logistics Agency to refuel military aircraft. In February 2005, the government notified CJC that it was initiating an investigation into whether CJC had sold contractually noncompliant fuel for use in military aircraft. In April 2005, the government terminated the Defense Logistics Agency's contract with CJC.

From May 2005 to January 2006, American Press published a series of articles describing the investigation of CJC's fueling practices. Henry asserts that these articles contained several defamatory statements, but focuses primarily on reports that CJC provided "contaminated fuel" to military aircraft that may have caused them to flame out.

On May 10, 2006, Henry sued American Press for defamation in Texas state court. American Press removed the case to the Southern District of Texas on the basis of diversity and later successfully moved to transfer the case to the Western District of Louisiana. On August 20, 2007, the district court determined that Louisiana substantive law governed the dispute and permitted American Press to file a special motion to strike pursuant to Article 971 of the Louisiana Code of Civil Procedure ("Article 971"). As discussed further below, Article 971 provides a mechanism whereby plaintiffs bringing certain tort claims must show a probability of success on their claim before proceeding. The district court initially denied American Press's Article 971 motion, and American Press requested reconsideration. The district court granted reconsideration and again denied American Press's motion in a more detailed opinion. American Press then filed a notice of appeal from the district court's order denying its Article 971 motion.

## II. STANDARD OF REVIEW

Louisiana law, including the nominally-procedural Article 971, governs this diversity case. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Welborn v. State Farm Mut. Auto. Ins. Co., 480 F.3d 685, 687 (5th Cir. 2007) (per

curiam); cf. United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 972–73 (9th Cir. 1999) (holding that a similar motion to strike under California state law applies in federal court); Thomas v. Fry's Elecs., Inc., 400 F.3d 1206, 1207 (9th Cir. 2005) (per curiam) (reaffirming Newsham).

This court has jurisdiction to determine its own jurisdiction. Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc., 481 F.3d 265, 268 (5th Cir. 2007). As to the merits, an Article 971 special motion to strike presents a question of law that Louisiana state courts review de novo. See, e.g., Melius v. Keiffer, 980 So. 2d 167, 170 (La. App. 4th Cir. 2008); Lamz v. Wells, 938 So. 2d 792, 795 (La. App. 1st Cir. 2006); Aymond v. Dupree, 928 So. 2d 721, 726 (La. App. 3d Cir.), writ denied, 938 So. 2d 85 (La. 2006). Thus, this court reviews de novo a district court's ruling on an Article 971 motion. Cf. Zamani v. Carnes, 491 F.3d 990, 994 (9th Cir. 2007) (reviewing de novo a district court's decision on a similar motion to strike under California state law); Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 676 (9th Cir. 2005) (same); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102 (9th Cir. 2003) (same).

## III. DISCUSSION

### A. Jurisdiction

#### 1. Louisiana's Article 971

A number of state legislatures have expressed concerns over the use (or abuse) of lawsuits that have the purpose or effect of chilling the exercise of First Amendment rights. These suits are commonly referred to as "strategic lawsuits against public participation," or "SLAPPs." In response to the growth of SLAPPs, some states have provided a procedural method—often called a "special motion to strike" but also known as an "anti-SLAPP motion" or "SLAPPback"—to weed out and dismiss meritless claims early in litigation. Dismissal of these frivolous tort claims saves defendants the cost and burden of trial and minimizes the chilling effect of these lawsuits. At the same time,

meritorious claims proceed, vindicating the interests of those who actually suffered from defamation or other torts.

Article 971 of the Louisiana Code of Civil Procedure provides one such method. In the act creating Article 971, the Louisiana legislature set out the reasons behind and purposes of the law:

> The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, it is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.

Thomas v. City of Monroe, 833 So. 2d 1282, 1286 (La. App. 2d Cir. 2002) (quoting 1999 La. Acts 734). Thus, "Article 971 was enacted by the legislature as a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press." Lee v. Pennington, 830 So. 2d 1037, 1041 (La. App. 4th Cir. 2002), writ denied, 836 So. 2d 52 (La. 2003); see also Lamz, 938 So. 2d at 796 ("The intent of Article 971 is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process."); Baxter v. Scott, 847 So. 2d 225, 231 (La. App. 2d Cir.) ("Article 971 is a procedural device to be used in the early stages of litigation to screen those claims which lack merit and which would chill public participation in matters of public interest."), vacated as moot, 860 So. 2d 535 (La. 2003); Stern v. Doe, 806 So. 2d 98, 100 (La. App. 4th Cir. 2001) ("The purpose of [Article 971] is to review frivolous and meritless claims against the media at a very early stage in the legal proceedings.").

The portion of Article 971 relevant to the present purposes provides as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

LA. CODE CIV. PROC. art. 971(A)(1). Once a defendant files an Article 971 motion, the trial court stays all discovery except that which the court, "on noticed motion and for good cause," orders to be conducted. Id. art. 971(D). The prevailing party on a special motion is entitled to reasonable attorneys fees and costs, id. art. 971(B), and a plaintiff that successfully establishes a probability of success on the merits may submit the trial court's determination as evidence at trial, id. art. 971(A)(3).

Article 971 establishes a burden-shifting analysis for weeding out frivolous claims. To succeed on an Article 971 motion, the defendant must first make a prima facie showing that Article 971 covers the activity underlying the suit. That is, the defendant must "establish[] that a cause of action against him arises from an act by him in furtherance of the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue." Starr v. Boudreaux, 978 So. 2d 384, 388–89 (La. App. 1st Cir. 2007). If the defendant makes this showing, "the burden then shifts to the plaintiff to demonstrate a probability of success on his claim." Id. at 389.

If the plaintiff fails to demonstrate a probability of success, the trial court dismisses the claim. Otherwise, the trial court denies the motion and the suit proceeds as it normally would. In Louisiana state courts, an unsuccessful movant can obtain immediate appellate review of the trial court's denial of the Article 971 motion through a writ of supervision under Article 2201 of the Louisiana Code of Civil Procedure. See LA. CODE CIV. PROC. art. 2201

6

("Supervisory writs may be applied for and granted in accordance with the constitution and rules of the supreme court and other courts exercising appellate jurisdiction."). Several Louisiana courts of appeal have immediately reviewed a trial court's denial of an Article 971 motion pursuant to these supervisory writs. See, e.g., Darden v. Smith, 879 So. 2d 390, 393 (La. App. 3d Cir.), writ denied, 887 So. 2d 480 (La. 2004); Baxter, 847 So. 2d at 230; Benson v. City of Marksville, 812 So. 2d 687, 690 (La. App. 3d Cir.), writ denied, 817 So. 2d 1158 (La. 2002).

## 2. The Collateral Order Doctrine

The threshold issue in this appeal is whether a district court's denial of an Article 971 motion is immediately appealable under 28 U.S.C. § 1291. "[S]ince appeals of right have been authorized by Congress . . . , there has been a firm congressional policy against interlocutory or 'piecemeal' appeals and courts have consistently given effect to that policy." Abney v. United States, 431 U.S. 651, 656 (1977). Section 1291 is part of that policy. Under § 1291, this court has "jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "For purposes of [§ 1291], a final judgment is normally deemed not to have occurred 'until there has been a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" Midland Asphalt Corp. v. United States, 489 U.S. 794, 798 (1989) (quoting Van Cauwenberghe v. Biard, 486 U.S. 517, 521 (1988)). Thus, as a general rule, parties must litigate all issues in the trial court before appealing any one issue. "Appeal is thereby precluded from any decision which is tentative, informal or incomplete, as well as from any fully consummated decisions, where they are but steps towards final judgment in which they will merge." P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 142 (1993) (quotation marks omitted).

In Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949), the

Supreme Court recognized the existence of a "small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Thus was born the "collateral order doctrine," which "establishes that certain decisions of the district court are final in effect although they do not dispose of the litigation." Davis v. E. Baton Rouge Parish Sch. Bd., 78 F.3d 920, 925 (5th Cir. 1996). The Cohen Court noted that it "ha[d] long given [§ 1291] this practical rather than a technical construction," 337 U.S. at 546, and later courts have emphasized that "[t]he collateral order doctrine is best understood not as an exception to the 'final decision' rule laid down by Congress in § 1291, but as a 'practical construction' of it," Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 867 (1994); see also Will v. Hallock, 546 U.S. 345, 349 (2006); Regan v. Starcraft Marine, LLC, 524 F.3d 627, 632 (5th Cir. 2008); Sherwinski v. Peterson, 98 F.3d 849, 851 (5th Cir. 1996). The primary issue in the present appeal, then, is whether a district court's denial of an Article 971 motion is among that "small class of interlocutory orders [that] are immediately appealable to the courts of appeals." Nixon v. Fitzgerald, 457 U.S. 731, 742 (1982).

To fall within Cohen's collateral order doctrine, an "order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978) (numbering added); see also Will, 546 U.S. at 349 (noting that "[t]he requirements for collateral order appeal have been distilled down to [these] three conditions"). Although the second condition requires that an issue be "important," there has been much confusion over where importance actually applies. See Kelly v. Ford Motor Co. (In re Ford Motor Co.), 110 F.3d

954, 959 (3d Cir. 1997) (noting that "the jurisprudence surrounding the importance criterion is somewhat murky"). Some Fifth Circuit cases treat separability and importance as two distinct conditions of the collateral order doctrine, see, e.g., Acosta v. Tenneco Oil Co., 913 F.2d 205, 207–08 (5th Cir. 1990), while others treat them as one, see, e.g., Goodman v. Harris County, 443 F.3d 464, 469 (5th Cir. 2006). The Supreme Court has discussed importance in the context of the third numbered element, unreviewability, and (as discussed below) recent Supreme Court decisions increasingly look to importance as a general and overarching consideration in the collateral order inquiry.

The confusion over where importance fits into the collateral order analysis is a symptom of the more general confusion over what constitutes a final collateral order. As Judge Jerome Frank once said,

> "Final" is not a clear one-purpose word; it is slithery, tricky. It does not have a meaning constant in all contexts. What was said as to "final" orders a half century ago still holds: The cases, it must be conceded, are not altogether harmonious. There is, still, too little finality about "finality." "A final decision" is not necessarily the ultimate judgment or decree completely closing up a proceeding. But it is not easy to determine what decisions short of that point are final.

United States v. 243.22 Acres of Land, 129 F.2d 678, 680 (2d Cir. 1942) (quotation marks, citations, and footnotes omitted). In determining finality, courts have been inconsistent in enumerating the conditions that an order must meet to be considered collateral, resulting in such a variety of formulations that "it is easy to point to cases that ignore some of [the collateral order conditions] or twist them into unrecognizable shapes." 15A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3911, at 329–30 (2d ed. 1992). The inconsistencies do not stop at the enumeration of conditions; applications of the conditions vary in their strictness, and distinctions drawn between cases are sometimes difficult to reconcile. As one

court has put it, "No one can make a seamless web out of all of the decisions on collateral orders." United States v. Billmyer, 57 F.3d 31, 35 (1st Cir. 1995). Other courts and commentators have maligned current finality jurisprudence as

> "hopelessly complicated," "legal gymnastics," "dazzling in its complexity," "unconscionable intricacy" with "overlapping exceptions, each less lucid than the next," "an unacceptable morass," "dizzying," "tortured," "a jurisprudence of unbelievable impenetrability," "helter-skelter," "a crazy quilt," "a near-chaotic state of affairs," a "Serbonian Bog," and "sorely in need of limiting principles."

Adam N. Steinman, Reinventing Appellate Jurisdiction, 48 B.C. L. REV. 1237, 1238–39 (2007) (citations omitted). Indeed, one commentator has suggested that the Cohen conditions are not really what determine whether an order is immediately appealable, as the collateral order doctrine's "cumbersome-yet-unhelpful framework" obscures "the policy judgments that actually determine whether immediate appellate review is available." Id. at 1243.

Part of this confusion stems from the three Cohen conditions—conclusivity, separability, and unreviewability. There exists in each of these conditions substantial nuance, and it is in this nuance that we find the interests that drive collateral order determinations. That is, the collateral order determination often involves, explicitly or not, a balancing of the interests in postponing appellate review (finality, efficiency, etc.) and in allowing immediate review (the importance of the asserted right, the consequences of disallowing immediate appeal, etc.). Moreover, although we sometimes speak of the three Cohen criteria as strict preconditions for appellate review, see, e.g., Goodman, 443 F.3d at 468, even a brief exploration of the case law reveals that they might better be regarded as guidelines in making the pragmatic determination of whether to allow an order to be immediately appealed.

Granted, a wholly pragmatic approach to finality inexcusably sacrifices clarity and predictability. Indeed, a case-by-case approach to the collateral order

doctrine would be inimical to the general final order rule, as it would require balancing in each and every case. Under such an approach, every order would be appealable if only to determine whether jurisdiction existed to appeal the order. Thus, a wholly pragmatic approach would undermine the interests that lie at the heart of the collateral order doctrine.

Consequently, we do not weigh the interests of granting and denying immediate appellate review in each and every case. Consistent with Supreme Court precedent and the general purposes of the final judgment rule, we determine whether an order is appealable as a general or categorical matter. See Cunningham v. Hamilton County, 527 U.S. 198, 206 (1999) ("[W]e have consistently eschewed a case-by-case approach to deciding whether an order is sufficiently collateral."); Digital Equip., 511 U.S. at 868 ("[T]he issue of appealability under § 1291 is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a particular injustice averted, by a prompt appellate court decision." (quotation marks, citation, and alteration omitted)); see also In re Carco Elec., 536 F.3d 211, 213 (3d Cir. 2008) ("[T]he Supreme Court's statement in Cunningham that we should not apply the collateral order doctrine on a 'case-by-case' basis indicates that we should not attempt to carve out individualized, case-specific exceptions to the general rule that discovery orders are not immediately appealable."). In other words, instead of making these decisions on a case-by-case basis, we make them on a type-of-order-by-type-of-order basis.

Thus, for our present purposes, we do not look to whether the order in the context of this particular case is immediately appealable, but to whether orders denying motions brought under anti-SLAPP statutes such as Article 971 satisfy the conditions of the collateral order doctrine. To do so, an order denying such a motion must be sufficiently conclusive, separate, unreviewable, and (perhaps most-importantly) important that the benefits of immediate appellate review

11

outweigh the loss of efficiency that any movement away from a strict finality approach entails.

### a. Conclusivity

We must first determine whether the denial of an Article 971 motion is conclusive. Conclusivity does not merely require that the specific issue be conclusively determined; were that the case, any issue on which a district court has rendered a decision would be conclusive. See Goodman, 443 F.3d at 468. Instead, for an order to be conclusive, it should not be subject to later review or revision in the district court. See Coopers & Lybrand, 437 U.S. at 469 (noting that the denial of a request for class certification is not conclusive under the collateral order doctrine because "such an order is subject to revision in the District Court"); Baldridge v. SBC Commc'ns., Inc., 404 F.3d 930, 931 (5th Cir. 2005) (noting that the denial of a request for certification for a Fair Labor Standards Act collective action is not conclusive under the collateral order doctrine because it "is subject to revision before the district court addresses the merits"). The mere power to revisit an order, however, is insufficient to preclude a finding of conclusivity; it should be unlikely that the district court will revisit the order. See 15A WRIGHT ET AL., supra, § 3911, at 333 ("So long as there is a plain prospect that the trial court may itself alter the challenged ruling, there is little justification for immediate appellate intrusion. The bare fact that the court has power to change its ruling, however, does not preclude review. It is enough that no further consideration is contemplated." (citations omitted)). That is, the order should be one that a district court rarely, if ever, revisits.

An order denying an Article 971 motion satisfies any concerns regarding conclusivity. A district court's denial of an Article 971 motion is conclusive as to whether Article 971 mandates dismissal of the suit. The motion freezes a suit while the court determines whether the plaintiff's claim has merit. If a trial court grants an Article 971 motion, the litigation ceases and the case is

dismissed. If a trial court denies an Article 971 motion, then the case proceeds as it normally would. There is also no indication that a trial court would revisit an earlier decision on an Article 971 motion. We therefore conclude that an order denying an Article 971 motion is conclusive for the purposes of the collateral order doctrine.

### b. Separability

Second, we must determine whether an Article 971 motion resolves an issue completely separate from the merits of the case. Issues are not separate "where they are but steps towards [a] final judgment in which they will merge." Cohen, 337 U.S. at 546. Moreover, where the issues raised in an interlocutory appeal "involve[] considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" the order is often found not to be separate. Coopers & Lybrand, 437 U.S. at 469 (quoting Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558 (1963)).

For example, in Pan Eastern Exploration Co. v. Hufo Oils, 798 F.2d 837, 838 (5th Cir. 1986), the trial court denied a foreign defendant's motion to dismiss proceedings against it based upon considerations of international comity. The defendant argued that the district court should have granted the motion out of deference to a Canadian court's order staying all judicial proceedings against the defendant. Id. In determining that the denial of the defendant's motion was not an immediately-appealable collateral order, this court noted that "the considerations necessary to decide whether to extend comity to the Canadian stay order [were] inextricably bound with the facts relevant to the merits." Id. at 839. Because "[t]he substantiality of [the plaintiff's] claims [was] relevant to the question [of] whether comity [was] consistent with domestic interests," the court concluded that the issues underlying the motion to dismiss were not sufficiently separate from the merits. Id. at 840.

In contrast, courts have held that issues concerning immunity from suit

are often separate from the underlying dispute in the litigation. For example, in Mitchell v. Forsyth, 472 U.S. 511, 527–28 (1985), the Supreme Court noted that a claim of qualified immunity "is conceptually distinct from the merits of the plaintiff's claim" because "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." Similarly, in Abney, the Court held that a denial of a claim of double jeopardy immunity was separate from the underlying dispute because "the very nature of a double jeopardy claim is such that it is collateral to, and separable from[,] the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged." 431 U.S. at 659 (italics omitted). The immunity decisions indicate that some involvement with the underlying facts is acceptable, as the Court has found the issue of immunity to be separate from the merits of the underlying dispute "even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." Mitchell, 472 U.S. at 529; see also Moore v. Felger, 19 F.3d 1054, 1057 (5th Cir. 1994) ("This court has exercised appellate jurisdiction when factual disputes relevant to the district court decision on the qualified immunity question were resolvable based on the record."). Thus, an order does not have to be separate from the entirety of the underlying dispute to satisfy Cohen.

At first blush, an order denying an Article 971 motion seems to clearly decide an issue separate from the merits; it determines only the issue of whether Article 971 requires dismissal of a suit. Our inquiry should not end here, however, as further consideration raises several concerns. First, the Article 971 determination requires an assessment of the plaintiff's probability of success. This risks involving an appellate court in the factual and legal issues underlying the plaintiff's claim. Indeed, the Article 971 determination is an assessment of the merits of a plaintiff's claim, and this court has previously suggested that

14

such an inquiry might weigh against a finding of separability. See Acosta, 913 F.2d at 208 (finding that a discovery order met the separability condition where "[r]eviewing the propriety of the order does not require this Court to examine the merits of [the plaintiff's] claim or [the defendant's] affirmative defense"). Second—assuming for the sake of argument that Article 971's evidentiary provision would apply in federal court—Article 971 allows plaintiffs to introduce a trial court's denial of a special motion to strike as evidence at trial. See LA. CODE CIV. PROC. art. 971(A)(3). Thus, although an Article 971 motion does not necessarily involve issues that arise later in the trial, issues that arise later in the trial might involve an Article 971 motion. This also weighs against a finding of separability. See Cohen, 337 U.S. at 546 (noting that collateral orders "are not of such an interlocutory nature as to affect, or to be affected by, decision of the merits of this case" (emphasis added)).

These potential entanglements, however, are insufficient to forestall a finding of separability. First, Article 971 has a purpose distinct from that of the underlying suit. As the Ninth Circuit reasoned in addressing the appealability of a similar California statute, an anti-SLAPP motion "resolves a question separate from the merits in that it merely finds that such merits may exist, without evaluating whether the plaintiff's claim will succeed." Batzel v. Smith, 333 F.3d 1018, 1025 (9th Cir. 2003). Moreover, "[t]he purpose of an anti-SLAPP motion is to determine whether the defendant is being forced to defend against a meritless claim," not to determine whether the defendant actually committed the relevant tort. Id. Article 971 thus "exists separately from the merits of the defamation claim itself." Id.

Further, the policy behind the collateral order doctrine militates in favor of finding separability. The final order rule limits appeals to encourage the aggregation of all necessary issues for one appeal and to provide for efficient adjudication. The separability requirement furthers this purpose by preventing

appeals on issues that will be definitively decided later in the case. In this way, one might characterize separability as a way of ensuring that a movant is not attempting to have an appellate court preemptively resolve a disputed issue still pending in the district court. Thus, in Pan Eastern Exploration Co., discussed above, the issue of whether interests of international comity warranted dismissal of the suit was dependent upon the interests in proceeding with the litigation, and the district court would balance these interests as the trial progressed. See 798 F.2d at 840. In contrast, issues of immunity are decided prior to trial and then not normally revisited. Consequently, even where the immunity determination looks to the facts underlying the dispute, the immunity determination is tangential to the merits of the underlying case. Similarly, although an Article 971 motion looks to the plaintiff's probability of success, the court decides it before proceeding to trial and then moves on. Immediate appellate review would thus determine an issue separate from any issues that remain before the district court.

Finally, the mere fact that a trial court's decision denying an Article 971 motion is admissible at trial does not change our conclusion. Article 971(A)(3), as originally enacted, provided,

> If the court determines that the plaintiff has established a probability of success on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the proceeding, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination.

1999 La. Acts 734. The Louisiana legislature amended this provision in 2004 to allow a trial court's denial of an Article 971 motion to be admissible at trial. See 2004 La. Acts 232 (amending Article 971(A)(3) to read, "If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding."). The purpose of this change is unclear, but this provision appears

to strike a balance between the costs and benefits of filing an Article 971 motion. That is, defendants should be hesitant to file a frivolous Article 971 motion, as an adverse decision can then be used against them at trial.

Although seeming to have a bearing on the underlying suit, we fail to see how this unique evidentiary provision affects our collateral order analysis in any substantial way. Granted, if an appellate court affirms a district court's denial of an Article 971 motion on an interlocutory appeal, this unique evidentiary rule could mean that an appellate court's assessment of the merits of a plaintiff's claim might influence future trial proceedings. But a decision on an Article 971 motion is not a ruling on the ultimate merits; it is merely tangential to the merits. A court deciding an Article 971 motion does not ask whether the plaintiff has proved her claim, but whether she has shown a sufficient probability of being able to prove her claim. This is akin to a court determining only that a plaintiff has presented a threshold showing that allows her claim to proceed. If the court's determination is later admitted into evidence, it is only one piece of evidence that the jury could choose to consider or reject. As such, it is hardly dispositive as to the merits of the suit. More importantly, this evidentiary provision does not render the denial of an Article 971 motion any less (or more) final; it does not affect the efficiency of judicial proceedings, blur the contours of the issue being appealed, or alter the interests that immediate appeal vindicates. This provision thus has only a minimal bearing on our inquiry.

Moreover, the minor possibility of minimal entanglement is insufficient to overcome the interests that favor a finding of immediate appealability. As discussed below, Article 971 aims to serve the substantial public interest of protecting those exercising their First Amendment rights from the chilling effect of defending meritless and abusive tort suits. Article 971 does so by immunizing speakers from suits stemming from the exercise of First Amendment rights, thus

preserving both an individual's right to speak and the public's collective interest in free and robust debate. The importance of the interests that Article 971 serves thus resolves any lingering doubts regarding separability. We therefore conclude that the denial of an Article 971 motion is sufficiently separate from the merits of the underlying case for the purposes of the collateral order doctrine.

c. Unreviewability

We must also determine whether a district court's denial of an Article 971 motion is effectively unreviewable on appeal. Unreviewability is "the fundamental characteristic of the collateral order doctrine." Pan E. Exploration Co., 798 F.2d at 840; see also Mitchell, 472 U.S. at 525 ("A major characteristic of the denial or granting of a claim appealable under Cohen's collateral order doctrine is that unless it can be reviewed before the proceedings terminate, it can never be reviewed at all." (quotation marks and alteration omitted)). As this court stated in Pan Eastern Exploration Co.,

> Because of this essential requirement, almost all denials of motions to dismiss are not immediately appealable. If, on appeal from a final judgment, an appellate court finds that the motion to dismiss should have [been] granted, it can direct the lower court to dismiss. The rights of the movant will have been vindicated, although after the movant has suffered the expense and delay of trial. As we have said before, however, this sort of injury follows in every denial of a motion to dismiss a complaint and does not justify an exception to the final-judgment rule.

798 F.2d at 840 (quotation marks omitted). Thus, the collateral order doctrine requires something beyond the right to prevail at an early stage of the proceedings for an order to be effectively unreviewable.

Perhaps the embodiment of unreviewability, then, is immunity from suit, "for the essence of . . . immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." Mitchell, 472 U.S. at 525. "The entitlement is an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial."

Id. at 526. In other words, immunity is not simply a right to prevail, but a right not to be tried. Thus, the Supreme Court and the Fifth Circuit have held that denials of various forms of immunity are immediately-appealable collateral orders. See P.R. Aqueduct & Sewer Auth., 506 U.S. at 144–45 (Eleventh Amendment immunity); Mitchell, 472 U.S. at 527–30 (§ 1983 qualified immunity); Nixon, 457 U.S. at 743 (absolute executive immunity); Helstoski v. Meanor, 442 U.S. 500, 508 (1979) (Speech and Debate Clause immunity); Abney, 431 U.S. at 662 (immunity from double jeopardy); Shanks v. AlliedSignal, Inc., 169 F.3d 988, 992 (5th Cir. 1999) (Texas state law immunity for communications made during judicial, quasi-judicial, or legislative proceedings); Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General, 923 F.2d 380, 385 (5th Cir. 1991) (Foreign Sovereign Immunities Act immunity); Brown v. Tex. A & M Univ., 804 F.2d 327, 332 (5th Cir. 1986) (Title VII qualified immunity).

The Supreme Court has warned, however, that "[o]ne must be careful . . . not to play word games with the concept of a 'right not to be tried,'" Midland Asphalt, 489 U.S. at 801, for "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial,'" Digital Equip., 511 U.S. at 873. "There is a crucial distinction between a right not to be tried and a right whose remedy requires the dismissal of charges. A right not to be tried in the sense relevant to the Cohen exception rests upon an explicit statutory or constitutional guarantee that trial will not occur." Midland Asphalt, 489 U.S. at 801 (quotation marks and citation omitted). For this reason, courts have held that certain constitutional and statutory "rights not to be tried" are effectively unreviewable for the purposes of the collateral order doctrine, while privately contracted "rights not to be tried" are not. See, e.g., Digital Equip., 511 U.S. at 884; Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 500–01 (1989).

The denial of an Article 971 motion satisfies the unreviewability condition.

The purpose of Article 971 is to free defendants from the burden and expense of litigation that has the purpose or effect of chilling the exercise of First Amendment rights. Article 971 thus provides a right not to stand trial, as avoiding the costs of trial is the very purpose of the statute. In other words, Article 971 does not provide a defense to liability; defendants remain liable for actual acts of defamation and other torts. But it does provide defendants the right not to bear the costs of fighting a meritless defamation claim. If an Article 971 motion is erroneously denied and unappealable, then the case proceeds to trial and this right is effectively destroyed. And in line with the Supreme Court's observation in Midland Asphalt, Article 971 provides an explicit statutory guarantee of a right not to stand trial.

We therefore conclude that the denial of an Article 971 motion is effectively unreviewable for the purposes of the collateral order doctrine. Not only does such a denial fall directly within the language of Midland Asphalt, but the interests underlying both the collateral order doctrine and Article 971 militate in favor of such a conclusion.[*]

  d.  Importance

As is perhaps evident from the above discussion, the traditional Cohen

---

[*] We recognize that this holding is not wholly in line with the Ninth Circuit's recent decision in Englert v. MacDonnell, 551 F.3d 1099 (2009). In Englert, the court held that the denial of a special motion to strike under Oregon's anti-SLAPP statute was not an immediately-appealable collateral order. Id. at 1104. Relying on the absence of a provision allowing immediate appellate review of such an order in Oregon state court, the Ninth Circuit determined that the Oregon legislature did not intend to give defendants a right not to be tried. Id. at 1105–06. Based on this determination, the court concluded that the denial of a special order to strike under Oregon law was not "effectively unreviewable" and thus not an immediately-appealable collateral order. Id.

 Like Oregon's anti-SLAPP statute, Article 971 does not include a provision expressly authorizing immediate appeal. But the practice of Louisiana courts appears to allow immediate appeals through writs of supervision. See Darden, 879 So. 2d at 393; Baxter, 847 So. 2d at 230; Benson, 812 So. 2d at 689–90. In any event, for the above-stated reasons, we hold that Article 971 creates a right not to stand trial, and denial of this right is therefore "effectively unreviewable."

factors for collateral order determinations—conclusivity, separability, and unreviewability—do not lend themselves to a satisfying and coherent exegesis. Conclusivity does not simply mean conclusive, as all orders can be construed at a level of generality that renders them conclusive as to a specific issue. Separability cannot mean wholly separate, as all orders bear some tangential relationship to the underlying dispute, with the relationship of some immediately-appealable issues quite more than tangential. And unreviewability cannot simply mean "effectively unreviewable," for any order can be reviewed on appeal, and the lack of appeal for any order can impose immense and unjust burdens on a wrongly-denied party.

One method of bringing some unity to the doctrine is to look to another factor in the collateral order analysis, and recent Supreme Court decisions seem to indicate that the focus of the inquiry is shifting to "importance." Granted, importance is nothing new to the doctrine. In the Court's original formulation of the collateral order doctrine, it stated that the doctrine covered those orders "too important to be denied review." Cohen, 337 U.S. at 546. The Court has also employed importance as a trump card for distinguishing its prior decisions; as the Court stated in United States v. MacDonald, 435 U.S. 850, 860 n.7 (1978),

> there is value—to all but the most unusual litigant—in triumphing before trial, rather than after it, regardless of the substance of the winning claim. But this truism is not to be confused with the quite distinct proposition that certain claims (because of the substance of the rights entailed, rather than the advantage to a litigant in winning his claim sooner) should be resolved before trial.

And as Justice Scalia stated in Lauro Lines, "The importance of the right asserted has always been a significant part of our collateral order doctrine." 490 U.S. at 502 (Scalia, J., concurring).

More recent decisions have increasingly looked to importance to clarify what is a less than clear area of the law. In Digital Equipment, the defendant argued that importance had no place in the collateral order analysis. 511 U.S.

21

at 875. The Court acknowledged that one "may validly question whether 'importance' is a factor 'beyond' the three Cohen conditions or whether it is best considered, as [the Court had] sometimes suggested it should be, in connection with the second, 'separability,' requirement." Id. at 878. But the Court dismissed outright any suggestion that "'importance' is itself unimportant," id., and indicated that importance informed both the second and third conditions of the collateral order doctrine, id. at 878–89. Moreover, regarding its preference for constitutional or statutory rights not to be tried, the Court stated that "[w]hen a policy is embodied in a constitutional or statutory provision entitling a party to immunity from suit (a rare form of protection), there is little room for the judiciary to gainsay its 'importance.'" Id. at 879. The Court's opinion can even be read to indicate that importance is actually the driving force behind the collateral order doctrine, as it defined "'important' in Cohen's sense[] as being weightier than the societal interests advanced by the ordinary operation of final judgment principles." Id. That is, an order is immediately appealable when the interests in permitting immediate appeals are sufficiently important to outweigh the interests of finality in denying immediate appeals.

The Supreme Court later emphasized the centrality of importance to determining appealability in Will. Recognizing that a multitude of orders denying a right not to be tried were effectively unreviewable, the Court "combed" its cases "for some further characteristic that merits appealability under Cohen." 546 U.S. at 351. "That something further boil[ed] down to a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement." Id. at 351–52 (quotation marks omitted). Thus, according to the Will Court, "compelling public ends rooted in the separation of powers" were behind the Nixon Court's decision that a denial of absolute executive immunity was immediately appealable; "threatened disruption of governmental functions, and fear of inhibiting able people from exercising

22

discretion in public service" drove the Mitchell Court's decision that a denial of qualified immunity was immediately appealable; the Puerto Rico Aqueduct Court based its decision that a denial of Eleventh Amendment immunity was immediately appealable not only on "the burdens of litigation," but also on "the need to ensure vindication of a State's dignitary interests"; and, in determining that a denial of double jeopardy immunity was immediately appealable, the Abney Court looked to "the enormous prosecutorial power of the government to subject an individual to embarrassment, expense and ordeal compelling him to live in a continuing state of anxiety."  Id. at 352 (quotations marks, citations, and alterations omitted).  The Court continued,

> In each case, some particular value of a high order was marshaled in support of the interest in avoiding trial:  honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interests, and mitigating the government's advantage over the individual. That is, it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is "effectively" unreviewable if review is to be left until later.

Id. at 352–53 (emphasis added).  The Court in Will ultimately held that the denial of a judgment bar motion under the Federal Tort Claims Act was not an immediately-appealable collateral order, as the order had "no claim to greater importance than the typical defense of claim preclusion."  Id. at 355.

If importance is what is underlying the distinctions between which orders are conclusive, separate, and unreviewable, then the Supreme Court seems to be endorsing an increasingly pragmatic approach to the collateral order doctrine. This is not to say that importance is a defining or controlling criterion of appealability, or that the collateral order determination is wholly ad hoc or unguided.  Importance instead informs the three Cohen criteria as well as our overall analysis.  And in determining importance, we find guidance in the

Supreme Court's emphasis on the vindication of substantial public interests, especially those with a constitutional or legislative basis.

In the present case, importance weighs profoundly in favor of appealability. Anti-SLAPP statutes such as Article 971 aim to curb the chilling effect of meritless tort suits on the exercise of First Amendment rights, and as the Supreme Court stated in Elrod v. Burns, 427 U.S. 347, 373 (1976), "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Indeed, the Supreme Court has time and again emphasized the importance of First Amendment rights. See, e.g., Curtis Publ'g Co. v. Butts, 388 U.S. 130, 165 (1967) (Warren, C.J., concurring in the result) (noting "the fundamental interests which the First Amendment was designed to protect"). And as Judge Posner once acknowledged, "in free-speech cases[,] interlocutory appeals sometimes are more freely allowed." Union Carbide Corp. v. U.S. Cutting Serv., Inc., 782 F.2d 710, 712 (7th Cir. 1986). Article 971 thus provides for the avoidance of a trial that would imperil a substantial public interest. Indeed, as Article 971 embodies a legislative determination that parties should be immune from certain abusive tort claims that have the purpose or effect of imperiling First Amendment rights, "there is little room for the judiciary to gainsay its 'importance.'" See Digital Equip., 511 U.S. at 879.

Considering all of the above, we hold that a district court's denial of a motion brought under an anti-SLAPP statute such as Article 971 is an immediately-appealable collateral order. Therefore, we have jurisdiction over the present appeal, and turn now to its merits.

B.    Special Motion to Dismiss

As mentioned above, Article 971 operates through a shifting of burdens. The party bringing the Article 971 motion "must make a prima facie showing that the matter arises from an act in furtherance of his or her right of free speech or the right of petition and in relation to a public issue." Darden, 879 So.

24

2d at 396. American Press has met this showing in the present case. First, as evident on the face of Henry's complaint, this dispute arises from a series of news articles published by American Press, an exercise of the right of free speech. Cf. id. at 396–97 (finding that a defendant met his prima facie case after looking solely to the face of the complaint). Moreover, the articles concerned the loss of a government contract and the investigation of an entity doing business with the federal government and the State of Louisiana, both matters of public interest. Cf. Starr, 978 So. 2d at 389; Darden, 879 So. 2d at 396. We therefore conclude that American Press has met its prima facie showing.

After the defendant has met its prima facie showing, the plaintiff must "demonstrate a probability of success on his or her own claim." Darden, 879 So. 2d at 396. A plaintiff contesting an Article 971 motion must show a probability that she will be able to establish all of the elements of her tort claim. Baxter, 847 So. 2d at 233. The elements of defamation under Louisiana law are: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." Kennedy v. Sheriff of E. Baton Rouge, 935 So. 2d 669, 674 (La. 2006). "In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." LA. CODE. CIV. PROC. art 971(A)(2); see also Baxter, 847 So. 2d at 232.

"To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." Baxter, 847 So. 2d at 231–32. This requires more than that which is necessary to survive a normal motion to dismiss, as "a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial." Estiverne v. Times-Picayune, L.L.C., 950 So. 2d 858, 860 (La.

25

App. 4th Cir. 2006) (quotation marks omitted). As one Louisiana court has noted, establishing a probability of success is a "difficult burden." Baxter, 847 So. 2d at 235. This burden is justified, however, as "the necessity of protecting our constitutional rights of free speech and petition, particularly when exercised in relation to public issues or matters of public interest, requires the imposition of this burden on a plaintiff who brings a defamation action impacting these rights." Id.

The only evidence in the record with which we can make this determination are the reprints of the newspaper articles and affidavits from Henry, retired Air Force Lieutenant Colonel J.K. Switzer ("Switzer"), and Henry's attorney, David K. Anderson ("Anderson"). The parties primarily dispute the standard of fault that applies to Henry's claim. We need not delve into this issue, however, for even if we assume that the most plaintiff-friendly standard—negligence—applies, we still hold that Henry has not established a probability of success on an essential element of his defamation claim.

Leaving aside the other elements, Henry has not established a probability of successfully proving fault. The district court based its determination that Henry had a probability of success in proving negligence on the statements in an affidavit from Henry's attorney, Anderson. Therein, Anderson stated that he contacted American Press, provided them with information that the stories were false, and also provided them with the contact information of Air Force personnel who could confirm the stories' falsity. Because American Press purportedly had notice of the stories' falsity but continued to publish them, the district court found that Henry had satisfied his burden on this element.

On appeal, American Press points out that Anderson's affidavit is evidence only that Anderson contacted American Press; it provides no indication that American Press did not follow up on the information Anderson provided. If Henry wanted to show evidence of American Press's negligence, he could have

introduced an affidavit from the person Anderson told American Press to contact indicating that American Press never contacted her. Indeed, the only way for the district court to find evidence of negligence in Anderson's affidavit is to conclude that the stories were in fact false and that American Press would have known that and would not have continued to publish them had it followed up on the information that Anderson provided. But even assuming that the stories were false, Anderson's affidavit does not show that American Press acted unreasonably in investigating and publishing the stories.

Granted, requiring such proof to establish a probability of success places a high burden on a plaintiff bringing a defamation claim. As discussed above, however, Louisiana courts have recognized that establishing a probability of success is a "difficult burden," Baxter, 847 So. 2d at 235, and this difficult burden exists to prevent frivolous torts from chilling exercises of First Amendment rights. If Henry had a meritorious case, he should have provided more evidence. In line with Article 971, the district court could have allowed limited, special discovery so that Henry could muster sufficient evidence to defeat American Press's motion. This ability, alongside Henry's failure to request any such discovery, undercuts any speculation that he did not have access to the evidence necessary to prevail.

We therefore hold that Henry has not shown a probability of success on his defamation claim. We reverse the district court's conclusion on this issue and render judgment dismissing Henry's claim.

C.  Attorney's Fees

Article 971(B) provides, "In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs." American Press requested fees and costs pursuant to this provision in its Article 971 motion. As the district court denied the motion, it never addressed this issue. Because we hold that the district court

erred in denying American Press's motion, we remand the case to the district court to determine the fees and costs, if any, to which American Press is entitled.

## IV.  CONCLUSION

We first hold that a district court's denial of an Article 971 motion is an immediately-appealable collateral order.  Thus, we have jurisdiction over this interlocutory appeal.  As to the merits, we REVERSE the district court's denial of American Press's Article 971 motion, RENDER judgment DISMISSING Henry's defamation complaint, and REMAND the case to the district court for a determination of fees and costs.

REVERSED, RENDERED, and REMANDED.