# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-30966

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2017

Lyle W. Cayce
Clerk

WALTER BLOCK,

> Plaintiff - Appellant,

v.

SAM TANENHAUS; JIM RUTENBERG; NEW YORK TIMES COMPANY,

> Defendants - Appellees.

———————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————

Before SMITH, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:

Plaintiff-appellant Walter Block appeals the dismissal of his defamation and false light claims against the New York Times and two of its authors. The district court dismissed his claims under Louisiana's anti-SLAPP statute, Article 971, finding that Block failed to create a genuine issue of fact as to falsity, fault, and defamatory meaning, which are essential elements of his claims. Block appeals, arguing that the district court erred by applying Article 971 and by determining under Article 971 that he failed to create a fact issue as to each of the elements of his claims. Because Block has created a fact issue, we REVERSE the dismissal of his claims and REMAND for further proceedings consistent with this opinion.

## I.

Block is an economics professor who holds the Harold E. Wirth Eminent Scholar Endowed Chair in Economics at Loyola University and is an Adjunct Scholar at the Mises Institute. He alleges that, consistent with his published writings and his self-described libertarian views, he articulated the following position during an interview with the New York Times (NYT):

> Free association is a very important aspect of liberty. It is crucial. Indeed, its lack was the major problem with slavery. The slaves could not quit. They were forced to "associate" with their masters when they would have vastly preferred not to do so. Otherwise, slavery wasn't so bad. You could pick cotton, sing songs, be fed nice gruel, etc. The only real problem was that this relationship was compulsory. It violated the law of free association, and that of the slaves' private property rights in their own persons. The Civil Rights Act of 1964, then, to a much smaller degree of course, made partial slaves of the owners of establishments like Woolworths.

Block alleges that the NYT misrepresented his statements in an article that attributed racist views to libertarian scholars and discussed how ties with libertarian thinkers would impact Senator Rand Paul's potential presidential candidacy.

The NYT article quoted Block twice, first as "[o]ne economist" and later by name as "Walter Block." The first quotation appeared in the immediate context of the statement that some Mises Institute scholars "have championed the Confederacy." It noted that "[o]ne economist, while faulting slavery because it was involuntary, suggested in an interview that the daily life of the enslaved was 'not so bad—you pick cotton and sing songs.'" Roughly eight pages or fifty-three paragraphs later, the article quoted Block by name in a paragraph that read as follows:

> Walter Block, an economics professor at Loyola University in New Orleans who described slavery as "not so bad," is also highly critical of the Civil Rights Act. "Woolworth's had lunchroom

2

counters, and no blacks were allowed," he said in a telephone interview. "Did they have a right to do that? Yes, they did. No one is compelled to associate with people against their will."

This paragraph appeared in the context of a discussion about the links between the Paul family and the Mises Institute, which questioned Senator Rand Paul's ability to distance himself from unpopular positions taken by Mises Institute scholars.[1]

Block sued the NYT, and the NYT made a special motion to strike under Article 971, which is Louisiana's anti-SLAPP statute. The district court granted the NYT's motion and dismissed the complaint. While Block's appeal was pending, the Fifth Circuit clarified that "Article 971's 'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Lozovyy v. Kurtz*, 813 F.3d 576, 586 (5th Cir. 2015). Accordingly, the Fifth Circuit remanded the case to the district court for application of the newly clarified Article 971 standard. *Block v. Tanenhaus*, 815 F.3d 218, 221 (5th Cir. 2016).

On remand, the district court again granted the NYT's Article 971 motion, dismissing Block's claims on the ground that Block failed to create genuine issues of fact as to falsity, fault, and defamatory meaning, which were essential elements of his defamation and false light claims. In this appeal, Block argues that the district court erred by applying Article 971 and, alternatively, that he created a fact issue as to each element of his claims.

## II.

The applicability of Article 971 is a question of law subject to *de novo* review. *Id.* at 220. "Under the *Erie* doctrine, federal courts sitting in diversity

---

[1] The immediate context of this paragraph associates Block with one scholar who opposed *Brown v. Board of Education* and with another scholar who applauded a KKK member's "right-wing populism."

apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). If there is a "direct collision" between a state substantive law and a federal procedural rule that is within Congress's rulemaking authority, federal courts apply the federal rule and do not apply the substantive state law. *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011).

Block argues that Article 971 is not applicable in federal court because it is procedural and because, even if it is substantive, it is in direct collision with the Federal Rules of Civil Procedure. The applicability of state anti-SLAPP statutes in federal court is an important and unresolved issue in this circuit.[2] Unfortunately for Block, his arguments against application of Article 971 have been forfeited. Each of them was either determined to be forfeited in his prior appeal or is now forfeited because he failed to raise them in his prior appeal. *See Block*, 815 F.3d at 221 n.3 (holding that Block forfeited his arguments related to burden shifting, discovery, and attorney's fees); *Lindquist v. City of Pasadena*, 669 F.3d 225, 239 (5th Cir. 2012) (holding that

---

[2] We have noted on several occasions that this is an open question. *See, e.g.*, *Block*, 815 F.3d at 221; *Cuba v. Pylant*, 814 F.3d 701, 706 & n.6 (5th Cir. 2016); *Lozovyy*, 813 F.3d at 582–83; *Culbertson v. Lykos*, 790 F.3d 608, 631 (5th Cir. 2015); *Mitchell v. Hood*, 614 F. App'x 137, 139 n.1 (5th Cir. 2015); *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 752–53 (5th Cir. 2014). These opinions post-date our decision in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009), which stated without explanation that "Louisiana law, including the nominally-procedural Article 971, governs this diversity case." *Id.* 168–69. In *Lozovyy*, we noted the possibility that, particularly in light of our subsequent decisions, *Henry* could be interpreted as assuming the applicability of Article 971 for purposes of that case without deciding its applicability in federal courts more generally. *Lozovyy*, 813 F.3d at 582–83. Similarly, we noted in *Pylant* that *Henry* did not address "whether, under the *Erie* doctrine, the array of state procedural rules surrounding anti-SLAPP motions to dismiss (*viz.* discovery stays, accelerated timetables for decision, and the like) follow the core anti-SLAPP motion to dismiss into federal court." *Pylant*, 814 F.3d at 706 n.6; *cf. id.* at 719 (Graves, J., dissenting) (addressing *Erie* question not reached by majority opinion and stating that similar anti-SLAPP statute in Texas is inapplicable in federal court because it is procedural (citing *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015)).

"an issue that could have been but was *not* raised on appeal is forfeited" and may not be revisited on remand by the district court or in a subsequent appeal). Accordingly, as in the prior appeal of this case and as in *Lozovyy*, we assume without deciding that Article 971 applies. *See Block*, 815 F.3d at 221; *Lozovyy*, 813 F.3d at 582–83.

### III.

Our review of a dismissal under Article 971 is *de novo*. *Henry*, 566 F.3d at 169. "[A] non-movant's burden in opposing an Article 971 motion to strike is the same as that of a non-movant opposing summary judgment under Rule 56." *Block*, 815 F.3d at 221. Thus, Block must demonstrate that there is a genuine issue of material fact as to falsity, fault, and defamatory meaning in order to show that the district court should not have granted the NYT's motion to dismiss under Article 971. *See id.* at 221–22.

### A.

A statement is actionably false if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). Inaccuracy in a quotation is not actionable "unless the alteration results in a material change in the meaning conveyed by the statement." *Id.* On the other hand, "an exact quotation out of context can distort meaning, although the speaker did use each reported word." *Id.* at 515. Thus, falsity is determined not only by the words in a purported quotation, but also "by reference to the meaning a statement conveys to a reasonable reader." *Id.* Under Louisiana law, a court "must consider the entirety of a statement in determining whether the statement is actionable." *Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993).

Block argues that, although he used the words attributed to him by the NYT, there is a genuine issue of material fact as to whether the NYT distorted

5

the meaning of his statements by omitting crucial context.  According to Block, the NYT communicated that he did not object to chattel slavery and implied that he was a racist when it stated, "Walter Block, an economics professor at Loyola University in New Orleans who described slavery as 'not so bad,' is also highly critical of the Civil Rights Act."  Block states that he used the words "not so bad" in a context that showed he was assessing the counterfactual and ahistorical scenario of slavery in the absence of any coercion rather than chattel slavery.  He points out that the deprivation of personal autonomy is antithetical to the libertarian views he expressed.  In sum, Block believes that his statements underscored the importance of free association and condemned chattel slavery precisely because it was involuntary, but that the NYT quoted him out of context to make it appear that he considered chattel slavery "not so bad."

Because the omission of context can distort the meaning of a direct quotation, there is a genuine fact issue as to whether the article misrepresented Block's statements. *See Masson*, 501 U.S. at 515; *see also Price v. Stossel*, 620 F.3d 992, 998, 1003 (9th Cir. 2010) (holding that there was a jury question as to falsity when a television broadcast used video clips of a pastor describing a wealthy man with a spiritually unfulfilled life because the original context of the pastor's statements indicated he was discussing a hypothetical individual but the context in the broadcast suggested he was discussing himself); *Sassone*, 626 So. 2d at 355 (suggesting that there was a jury question as to falsity when a television broadcast used a district attorney's allegedly hypothetical statement in a context that suggested he was assessing the actual conduct of a specific criminal defendant, but ultimately deciding on other grounds).  If, as Block has pleaded, he stated during the interview that slavery was "not so bad" *except for its involuntariness*, a reasonable jury could

6

determine that the NYT's decontextualized quotation falsely portrayed him as communicating that chattel slavery itself was not problematic—exactly the opposite of the point that he says he was making.

The NYT offers three arguments to the contrary, but none are sufficient to merit dismissal at this stage in the litigation.  First, the NYT argues that it was correct in stating that Block described chattel slavery as "not so bad." According to the NYT, his reference to picking cotton and singing songs "leaves no room for doubt" that he was describing chattel slavery.  However, stating that cotton-picking and song-singing are "not so bad" in themselves, if done without coercion, is not at all the same thing as saying that chattel slavery was "not so bad."  Chattel slavery by definition involves coercion and being treated as the property of another, and Block alleges that the context of his original statement indicated his view that coercion is unacceptable and violates people's rights as belonging to themselves.  If the context of his statement is what he alleges, Block's statement made clear that he would only describe slavery as "not so bad" to the extent that, unlike chattel slavery, it was voluntary.  Accordingly, we reject the argument that Block's references to cotton and songs conclusively demonstrate that the NYT was correct in stating that Block considered chattel slavery to be "not so bad."

Second, the NYT argues that it communicated Block's objection to coercion by stating earlier in the article that an unnamed economist, "while faulting slavery because it was involuntary, suggested in an interview that the daily life of the enslaved was 'not so bad . . . .'"  This statement could be relevant to the meaning that the article as a whole communicates to a reasonable reader about Block's views on slavery.  *See id.* at 352.  However, the statement does not mention Block by name and appears roughly eight pages before the paragraph of which Block complains.  Thus, it could be that a

7

reasonable reader would not associate the two passages and would not infer that Block, who "described slavery as 'not so bad,'" is the same person as the unnamed economist who "fault[ed] slavery because it was involuntary." In fact, the president of the university at which Block teaches failed to draw this inference and wrote a public letter criticizing Block for "claim[ing] that chattel slavery 'was not so bad'" and stating that Block had contradicted his own libertarian principles by suggesting that "slavery enforced against someone's free will" was acceptable. The record also contains a police report indicating that, after the article's publication, two young men approached Block on the campus at which he teaches and told him, "You're the [expletive] who said slavery was okay. We're gonna getcha." We conclude there is a fact issue regarding the meaning that the article conveys to a reasonable reader.

Third, the NYT argues that Block's pleaded truth would have had the same "effect on the mind of the reader" as the message that the article conveyed. *See Masson*, 501 U.S. at 517. The district court itself stated that both the NYT's portrayal of Block and Block's own statements, accurately conveyed, would "ignite fury" in readers. However, the "effect on the mind of the reader" does not refer to the emotions that a statement incites. Rather, it refers to "the meaning a statement conveys to a reasonable reader." *Id.* at 515.

In sum, Block has created a genuine issue of material fact as to the falsity of the NYT article. The NYT's first two arguments to the contrary cannot be resolved on an Article 971 motion to dismiss at this stage. The NYT's final argument to the contrary misstates the law. Accordingly, dismissal is not justified on the ground that Block failed to create a fact issue as to falsity.

**B.**

Because Block is a public figure, the fault element of his claims requires proof of actual malice, which is defined as knowledge of falsity or reckless

disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Block argues that there is a fact issue as to actual malice wherever a news source materially alters the meaning of a quotation. *See Masson*, 501 U.S. at 517–18, 521 (holding that there is a fact question as to actual malice where a news source alters a quote in a manner that changes its meaning); *Sassone*, 626 So. 2d at 355 (suggesting that there is a fact question as to actual malice where a news source alters the context of a quotation in a way that changes its meaning, but ultimately deciding on other grounds).

The NYT does not dispute this characterization of the law. Rather, it contends that it did not materially alter the meaning of the quotation. Similarly, the district court based its determination that Block failed to create a fact issue as to actual malice on its view that the NYT did not change the meaning of the quotation but accurately communicated Block's views. As discussed above, there is a genuine issue of material fact as to whether the NYT altered the meaning of the quotation. Accordingly, the district court's determination and the NYT's argument depend on a factual premise that has not yet been established, and dismissal for failure to create a fact issue as to actual malice was premature.

## C.

Under Louisiana law, a statement is defamatory if it "tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Sassone*, 626 So. 2d at 352. Whether a statement is capable of defamatory meaning is a question for the court, but whether the recipient understood the statement to convey a defamatory meaning is a question for the jury. *Id.* at 352 & n.9. In evaluating whether a statement is capable of defamatory meaning, a court asks "whether a listener could have reasonably understood the communication, taken in

context, to have been intended in a defamatory sense." *Id.* at 352. Statements are defamatory *per se* if they "expressly or implicitly accuse another of criminal conduct" or "by their very nature tend to injure one's personal or professional reputation." *Wood v. Del Giorno*, 974 So. 2d 95, 99 (La. App. 4 Cir. 2007).

Block argues that the article is defamatory *per se* because communicating that someone views chattel slavery as "not so bad" has a natural tendency to harm that person's reputation. He adds that reading the NYT's description of his views in the context of the article as a whole only reinforces this defamatory meaning by portraying libertarians as racists. Finally, Block notes that the record contains evidence of harm to his reputation. The record contains a public letter authored by the president of his own university that criticized him for suggesting that "slavery enforced against someone's free will" was acceptable. It also contains a police report indicating that Block was threatened by two young men who believed he had "said slavery was okay." Finally, the record contains a declaration by Block stating, among other things, that eighteen of Block's colleagues publicly called for his school to condemn and censure him for the views expressed in the NYT article; that Block has been threatened with physical harm, including by students who accused him of saying slavery was acceptable; and, more generally, that the article prompted attacks on Block's professional reputation, scholarship, and personal character.

The NYT does not dispute that describing someone as believing that chattel slavery is "not so bad" has a natural tendency to harm that person's reputation. Instead, it argues that the article made no such accusation. Likewise, the district court determined that the article did not have a defamatory meaning because, in light of the quote that noted Block's objection to coercion without mentioning him by name, the article "does not brand Block

10

as someone who considers slavery not so bad." However, as explained above, the unattributed quotation does not eliminate the fact issue as to whether a reasonable reader would understand the article to describe Block as having accepted chattel slavery. Because it is undisputed that such a description of Block would be defamatory, dismissal for failure to create a genuine fact issue as to whether the article had a defamatory meaning was premature.

## IV.

For the reasons explained above, we conclude that Block has created a genuine issue of material fact as to falsity, fault, and defamatory meaning. Accordingly, we REVERSE the district court's judgment of dismissal under Article 971 and REMAND for further proceedings consistent with this opinion.