# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10212

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2016

Lyle W. Cayce
Clerk

DONALD CUBA,

Plaintiff–Appellee,

versus

JULIA PYLANT, DONALD PYLANT, AND LESLIE PYLANT,

Defendants–Appellants.

\* \* \* \* \* \* \*

No. 15-10213

JULIA PYLANT,

Plaintiff–Appellant,

versus

DONALD CUBA,

Defendant–Appellee.

Appeals from the United States District Court
for the Northern District of Texas

No. 15-10212
No. 15-10213

Before SMITH, WIENER, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

These consolidated appeals stem from two parallel suits between Donald Cuba, an individual accused (but later acquitted) of rape, and Julia Pylant ("Julia"), his purported victim. In No. 15-10212, Cuba sued Julia and her parents Donald and Leslie Pylant (collectively "the Pylants") for malicious prosecution, defamation, and tortious interference with contractual relations. In No. 15-10213, Julia sued Cuba for assault and battery and intentional infliction of emotional distress ("IIED"), and Cuba counterclaimed with causes of action substantially identical to those in his suit. In both suits, the Pylants moved to dismiss Cuba's claims under the Texas Citizens' Participation Act ("TCPA") (Texas's anti-SLAPP[1] statute).

The district court failed to issue a ruling on the dismissal motions within the TCPA's time limits. In its eventual rulings on the dismissal motions in both cases, the court concluded that because it had not ruled by the deadline, the motions had already been denied by operation of law, as specified by the statute. It therefore denied the motions as moot. The Pylants took an interlocutory appeal in both cases. We vacate and remand.

## I.

Julia Pylant and Donald Cuba were students at Southern Methodist University ("SMU"). On February 13, 2012, Julia told SMU authorities that Cuba had sexually assaulted her a few days earlier. An SMU disciplinary board held a hearing on March 27 and two days later found that Cuba was

---

[1] "SLAPP" is the commonly used acronym for a strategic lawsuit against public participation—abuse of defamation and similar causes of action to chill the defendant's participation in public controversies.

No. 15-10212
No. 15-10213

"responsible" for violating university prohibitions on irresponsible conduct, sexual misconduct, and sexual assault. But after Cuba appealed to the university's disciplinary body, the charges were dismissed on the grounds that there were prejudicial procedural irregularities and that the evidence in the initial hearing was not sufficient to support the findings.

In response to the dismissal, Julia's parents wrote to SMU President Gerald Turner on August 7, asking him to reverse the disciplinary board's dismissal and send the matter back for further consideration; Turner agreed to that request and notified the Pylants on August 17 that he was reinstating the disciplinary charges and submitting them for further consideration. At about that time, Cuba was informed that there would be a new round of hearings.

Julia testified before a state grand jury on September 4. The grand jury issued an indictment two days later charging Cuba with rape. Cuba took a medical leave of absence from SMU on September 17, putting the university disciplinary processes on hold. He was acquitted in a state-court trial in May 2013.

On September 12, 2013, Cuba sued the Pylants. His amended complaint of December 8, the operative pleading in these appeals, asserted claims for malicious prosecution, defamation, and tortious interference with contract, stemming from statements made by the Pylants to SMU and the prosecuting authorities. SMU held another disciplinary hearing on September 18 at which Cuba was found "not responsible" for the disciplinary violations.

In January 2014, Julia sued Cuba for assault and battery and IIED; Cuba asserted counterclaims identical to those in his own suit—malicious

3

No. 15-10212
No. 15-10213

prosecution, defamation, and tortious interference—as well as IIED.[2]

In both cases, the Pylants moved to dismiss Cuba's claims and counter-claims on various grounds, including Rule 12(b)(6) of the Federal Rules of Civil Procedure and, as relevant in this appeal, the TCPA. The elder Pylants filed their initial TCPA motions in Cuba's suit on October 8, 2013; Julia filed her initial TCPA motion on November 18. On November 20, counsel for the Pylants filed a letter with the court, asking it to take the TCPA's scheduling rules into consideration. That letter outlined the relevant deadlines and requested a timely hearing and decision.[3] Cuba filed an amended pleading, so the Pylants filed a new round of TCPA motions on December 30. In the Pylants' suit, Julia filed her TCPA motion on March 7, 2014.

The district court did not schedule a hearing or rule on the TCPA motions within the state statutory deadlines. But when it did eventually rule—on March 6, 2015—it held that the motions were moot because they had already been denied by operation of law.[4] The court reasoned that, to the extent it was permitting the motion to be brought under the TCPA at all, it was also bound

---

[2] The IIED claim is not at issue in these appeals.

[3] As explained in greater detail below, the TCPA sets out an accelerated timetable for consideration of motions to dismiss. A court must quickly set a hearing on the motion (a maximum of 90 days after the motion is filed, unless the court allows discovery on the motion—which it did not do here), *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.004 (West 2013), and render a decision on the motion within 30 days of that hearing, *see id.* § 27.005. If it fails to do so, the motion is deemed denied by operation of law, and the moving party may appeal. *Id.* § 27.008(a).

[4] The district court did not specify the date on which it believed the motions had become moot. It did say, however, that the ruling had not been issued within 30 days of a hearing scheduled on the last possible day—in other words, 120 days after the motions were filed. The 120-day number comes from adding the 90-day deadline for setting a hearing after the motion is filed and served (the longest deadline for setting a hearing—120 days—would not apply because there was no TCPA discovery permitted) and the 30-day deadline for deciding the motion after the hearing. Although the TCPA motions were filed on different days in the parallel cases, the difference in the dates is not material.

No. 15-10212
No. 15-10213

by the TCPA's timing requirement. Because it had not scheduled a hearing or ruled on the motion—and under Texas caselaw the court has no discretion to extend the deadline—it held that it was bound to reject the motions as moot because the state procedural deadlines had run.[5]

II.

As a general matter, this court has jurisdiction over an interlocutory appeal from an order denying a TCPA motion to dismiss. *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 748 (5th Cir. 2014). Cuba urges, however, that we lack jurisdiction over these appeals because the Pylants did not timely appeal. Cuba reasons that the 30-day clock to file a notice of appeal under Rule 4 of the Federal Rules of Appellate Procedure started to run when the TCPA motions to dismiss were denied by operation of law under the state statute: 120 days after they were filed. Thus, by Cuba's account, these appeals became time-barred 150 days after the TCPA motions were filed—meaning that the appeals has been untimely since the summer of 2014.

The Pylants contend, to the contrary, that *NCDR* stands for the proposition that the TCPA's scheduling rules are not binding in federal court. Therefore, the Pylants claim, their appeals are timely because the TCPA motion was not denied until the district court formally rejected it and they timely filed a notice of appeal thereafter. In the alternative, the Pylants aver that because the court never held a hearing on the TCPA motion, the 30-day

---

[5] Specifically, the court, in a twenty-four-page order, granted in part, denied in part, and found moot in part the motion to dismiss. It granted the motion to the extent that it sought dismissal of the defamation claims based on Julia's March 2012 reports as barred by the one-year statute of limitations and her grand jury and trial testimony as absolutely privileged. The court found the motion to dismiss moot the extent it relied on the TCPA. It otherwise denied the motion.

5

No. 15-10212
No. 15-10213

countdown for a decision never began.

To decide whether the appeals are timely, we first review the TCPA framework, which we assume—without deciding—controls as state substantive law in these diversity suits.[6] Second, we review the parties' positions. We ultimately agree with the Pylants' alternative argument, *viz.*, that, under the TCPA framework, the 30-day deadline before a motion is deemed denied by operation of law runs only from the date of the hearing on the motion. But, because no such hearing was held in these cases, the TCPA motion was not denied by operation of law. The operative date from which the 30-day clock under Rule 4 ran was March 6, 2015, the date of the order denying the motion, so the appeals are timely.

## A.

"The purpose of the TCPA is 'to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.'" *NCDR*, 745 F.3d at 746 (quoting TEX. CIV. PRAC. & REM. CODE

---

[6] This court held, under the materially similar Louisiana anti-SLAPP statute, that a federal-court defendant may bring a motion to dismiss. *See Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 169 (5th Cir. 2009). The *Henry* court reasoned that even though the Louisiana anti-SLAPP statute was built around a procedural device—a special motion to dismiss—it nonetheless applied in federal court under the *Erie* doctrine because it was functionally substantive. *Id.* But *Henry* does not resolve an important subsidiary question that these appeals raise but that the parties fail to address: whether, under the *Erie* doctrine, the array of state procedural rules surrounding anti-SLAPP motions to dismiss (*viz.* discovery stays, accelerated timetables for decision, and the like) follow the core anti-SLAPP motion to dismiss into federal court. Neither party contends that this matter should be resolved on *Erie* grounds by ruling that the Texas-law timing deadlines are state procedural law inapplicable in federal court. Therefore, we assume, without deciding, that the state procedural rules—including the deadline for issuing a decision before it is denied by operation of law—do in fact apply in federal court.

No. 15-10212
No. 15-10213

ANN. § 27.002 (West 2013)).  "To achieve this, the TCPA provides a means for a defendant, early in the lawsuit, to seek dismissal of certain claims in the lawsuit.  If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action."  *Id.*  (citations omitted).

The TCPA fleshes out this dismissal mechanism in a variety of ways.  It provides that the filing of a TCPA dismissal motion stops discovery in the action until the court has ruled, save for limited discovery relevant to the motion. TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(c), 27.006(b) (West 2011). The statute further provides for an accelerated timetable for resolving the asserted TCPA defense:  The court must set a hearing on the motion within 60 days of service (90 or 120 days in certain exceptional cases involving crowded dockets, good cause, or TCPA-related discovery), *id.* § 27.004, and the court must rule on the motion within 30 days after the hearing, *id.* § 27.005.  If it fails to do that, the motion is deemed denied by operation of law, and the defendant may appeal.  *Id.* § 27.008(a).  Courts have no discretion to extend the time to issue a decision—an out-of-time ruling is a legal nullity.[7]

Applying these rules as it understood them, the district court held that the motion had been denied by operation of law 120 days after it was filed, so any ruling on the motion was a nullity.  If the court was correct, these appeals are untimely:  The 30-day Rule 4 clock would have started running in the summer of 2014, far before the appeals were initiated.

---

[7] *See Jain v. Cambridge Petroleum Grp., Inc.*, 395 S.W.3d 394, 396 (Tex. App.—Dallas 2013, no pet.) ("The trial court's signing the order denying the motion after it was already denied by operation of law is legally of no effect because the motion to dismiss was already denied.").

7

No. 15-10212
No. 15-10213

B.

The Pylants advance two basic reasons why the appeals are timely. The first is that *NCDR* dictates that the state-law timetable under the TCPA has no effect in federal court. The second is that the 30-day deadline under Section 27.008(a) never started to run, because the court failed to hold the required motion hearing from which the deadline runs.

The Pylants' first theory, regarding the *NCDR* decision, has three inter-related sub-arguments. None is persuasive.

First, the Pylants assert that "regardless of why or when the District Court denied the Motions, this Court has jurisdiction to review the denial of the Motions despite the state court deadlines." For that they rely on *NCDR*'s declaration, 745 F.3d at 750, that "[t]o be sure, state law does not control the question of whether appellate review is available in federal court." But that quotation is from the portion of the opinion discussing whether a denial of a TCPA motion is subject to federal interlocutory review under the collateral-order doctrine, *see id.*, and has nothing to do with the question here. The court made the above-quoted statement in the context of a discussion in its *Cohen* collateral-order-doctrine[8] analysis of the evidentiary force of the fact that the Texas statute *did* provide for interlocutory review. The court decided that the availability of interlocutory review suggested that the anti-SLAPP statute was designed to confer a right to immunity from trial on those whom it protected and thus should be subject to interlocutory review. *Id.* at 750–51.

A more contextually accurate rendering of the quoted language, then, would be this: "To be sure, state law [governing the availability of an

---

[8] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47 (1949).

interlocutory appeal] does not control the question of whether [interlocutory] appellate review is available in federal court [under the *Cohen* collateral review doctrine]." The quotation is hardly support for the proposition that the Pylants appear to be advancing, i.e., that appellate review would be available here even if the state-law deemed denial had indeed taken place, and had taken place at a time more than thirty days before the Pylants appealed. Nowhere does *NCDR* suggest, much less hold, that the deemed state-law denial would not be the order from which the appellate clock would run.

Second, the Pylants point to language in *NCDR* describing and quoting the TCPA accelerated-appeals provision. The language in question is from Section 27.008 and provides that "[a]n appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005." The Pylants cite that language to support their notion that *NCDR* held that the clock for an appeal "run[s] from *either* the order denying the Anti-SLAPP *or* from an express failure to rule."

The language the Pylants quote does not support their contention and does nothing more than instruct a court to expedite appeals from both explicit and deemed denials of motions brought under the statute. It has nothing to do with when the clock starts running on an appeal. Second, *NCDR* says nothing like what the Pylants are urging. Indeed, even though the appellees in that case advanced an untimeliness argument in their brief along precisely the lines at issue here,[9] the court's *only* discussion of the portion of the brief in which

---

[9] *I.e.*, the notice of appeal was filed only after the district court denied the motion, which decision was issued outside of the maximum time to set a hearing plus the maximum

No. 15-10212
No. 15-10213

that timeliness argument was advanced was in its decision that all arguments regarding conflicts between the Federal Rules and the TCPA were waived. *NCDR*, 745 F.3d at 752–53.

That is to say, the court did not address the timeliness argument that was raised in the brief. There is nothing in *NCDR* to support the Pylants' contention that the appellate clock starts running from the later of an order denying the motion or a failure to rule that operates as a deemed denial of the motion. If the TCPA's timing provisions apply in this case, and if those provisions do in fact dictate that the motion here was deemed denied by the failure to rule timely on it, the only logical time under Section 27.008 for the appellate clock to run would be from the date of the deemed denial.[10]

Third, the Pylants reference the docket of the *NCDR* case. They correctly note that that court entertained an appeal from a merits denial of a TCPA motion announced more than 120 days after the motion was filed. But the court in no way addressed the timeliness issue. The only discussion of the section of the brief in which the timeliness argument was discussed was the waiver discussion referenced above (and indeed the court does not appear to make any direct reference to the timeliness issue itself). That the court passed over a potential jurisdictional problem does not support the Pylants' argument. There is no such thing as a precedential *sub silentio* jurisdictional holding: "When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

---

time to rule.

[10] As noted above, the Texas cases are clear that an order entered after a deemed denial is a legal nullity for timeliness-of-appeal purposes. Accordingly, there is nothing in an out-of-time order from which the appellate clock could run. *See Jain*, 395 S.W.3d at 396.

10

No. 15-10212
No. 15-10213

Thus, the mere fact that the court in *NCDR* did not address the issue at hand, despite the fact that it was arguably present there, does not say anything regarding the timeliness of these appeals.

The Pylants' second contention is the most persuasive of the three. They properly identify the key weakness in the district court's reasoning: that the court failed to schedule a hearing on the motion. But as required under the statute, the clock for denial of a TCPA motion by operation of law runs from the date of the hearing. Section 27.004 has clear, mandatory language and is worth studying in full:

> (a) A hearing on a motion under Section 27.003 *must* be set not later than the 60th day after the date of service of the motion unless the docket conditions of the court require a later hearing, upon a showing of good cause, or by agreement of the parties, but *in no event* shall the hearing occur more than 90 days after service of the motion under Section 27.003, except as provided by Subsection (c).
>
> (b) In the event that the court cannot hold a hearing in the time required by Subsection (a), the court may take judicial notice that the court's docket conditions required a hearing at a later date, but *in no event* shall the hearing occur more than 90 days after service of the motion under Section 27.003, except as provided by Subsection (c).
>
> (c) If the court allows discovery under Section 27.006(b), the court may extend the hearing date to allow discovery under that subsection, but *in no event* shall the hearing occur more than 120 days after the service of the motion under Section 27.003.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.004 (West 2013) (emphasis added). And the thirty-day clock for a ruling runs from "the date of the hearing on the motion." *Id.* § 27.005(a). The denial-by-operation-of-law provision is similarly pegged to the date of the hearing: "If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal."

11

No. 15-10212
No. 15-10213

There is nothing in the statute that contemplates the failure to schedule a hearing. Given that the deadline for ruling on the motion before it is deemed denied is explicitly pegged to the date of the hearing and that no hearing occurred, a straightforward reading of the statute indicates that the motion was never deemed denied by operation of law. And the statute, as just quoted above, has no language contemplating a denial by operation of law if there has been no hearing. Therefore, the motion could not have been denied by operation of law, given that the only statutory basis for a deemed denial is explicitly based on the clock's running from a hearing.[11]

Cuba's briefing on the timeliness issue rests entirely on the district court's justification: No hearing was held within even the longest timeframe permitted under the statute, and no decision issued within thirty days of the last day that the hearing could have been held. Therefore, Cuba says, all of the TCPA motions were denied by operation of law long before the ruling, and the time for appeal ran from the dates of those denials, rendering this appeal untimely. But Cuba never addresses the Pylants' second argument or the fact that the statute links denial by operation of law to the date of the hearing. As we have explained, the failure to schedule a hearing means that the Section 27.008(a) clock never started running.

The district court's determination that the motion was denied by operation of law, 120 days after filing, is error. The TCPA motions were not ruled

---

[11] This textual conclusion also has the advantage of being the fair result: It would be inequitable to deny to the Pylants their right to be heard on their TCPA motion by ignoring Section 27.004 while simultaneously summarily rejecting their arguments by enforcing Section 27.008(a)'s denial-by-operation-of-law provision. That inequity would be compounded by the fact that the court was on notice of the statutory provisions: The Pylants filed a letter brief explaining the TCPA framework for the court to take into account in addressing their TCPA motions.

on until the court denied them in its March 6, 2015, order. This appeal was noticed well within the thirty-day Rule 4 time frame. Therefore, the appeal is timely, and this court has jurisdiction. We therefore turn to the merits of the Pylants' TCPA motion to dismiss.

## III.

Because the motion to dismiss presents purely legal issues that were extensively briefed in the district court and would be subject to *de novo* review on appeal, we need not remand the TCPA issues.[12] First, we review the analysis that a court is to perform under the TCPA. Second, we determine whether the TCPA applies to the conduct and claims at issue here. Because the TCPA does apply, the third portion of our analysis looks to each of Cuba's claims to decide whether it survives the motion to dismiss. We conclude that the motion should be denied as to the malicious-prosecution claim, granted in part and denied in part as to the defamation claim, and granted as to the tortious-interference-with-contract claim.

## A.

The TCPA sets out a two-step inquiry when a party moves to dismiss. The movant has the initial burden to show, by a preponderance of evidence, that the activity that forms the base of the claim against him is protected by the statute—that is to say, that the suit arises from the movant's exercise of his right to free speech, association, or petition. If he meets that burden, the trial court must dismiss unless the party opposing dismissal can point to "clear and specific evidence" that establishes a *prima facie* case for each essential

---

[12] *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir.) *modified on other grounds on denial of reh'g,* 409 F.3d 653 (5th Cir. 2005).

No. 15-10212
No. 15-10213

element of his claim. *See In re Lipsky*, 460 S.W.3d 579, 586–87 (Tex. 2015) (explaining the two-step inquiry). The "clear and specific evidence" requirement, however, as interpreted by Texas courts, is more like a pleading requirement than a summary-judgment standard. The TCPA section on "Evidence" provides that "[i]n determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006 (West 2011). And the Texas cases inform that a litigant's evidentiary burden in a TCPA motion may be satisfied by either detailed pleading or supporting affidavits: A party need not provide "evidence" in the traditional sense if the pleadings are sufficiently clear.[13]

### B.

The TCPA applies to these claims. As the Pylants posit and Cuba largely concedes, all of the acts that the Pylants are being sued for—statements to the Dallas County law enforcement authorities and to SMU officials—are exercises of the right to petition as defined under the statute.

Section 27.001(4) provides that the right to petition covers communications "in or pertaining to" judicial proceedings and proceedings "in or before a managing board of an educational or eleemosynary institution supported

---

[13] *See Serafine v. Blunt*, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.) (stating that "[t]he Act does not require Serafine to present testimony or other evidence to satisfy her evidentiary burden," and citing cases saying that pleadings are "evidence" under the statute); *see also Lipsky*, 460 S.W.3d at 590–91 ("Because the Act requires more, mere notice pleading—that is, general allegations that merely recite the elements of a cause of action—will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim. In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss.").

directly or indirectly from public revenue."[14]   Communications "reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body" also come within the statutory definition of the right to petition.  Though Cuba contends that the statements and actions by the Pylants that form the basis of the suit are not "free speech" as defined in the statute, his only response to the Pylants' argument that *all* of their statements and actions at issue were an exercise of the right to petition is his claim that the Pylant parents' letter to the president of SMU is not covered by that portion of the statute because there was not a live "proceeding" when the letter was sent.

Cuba therefore concedes that all other statements and actions directed to SMU and the Dallas County authorities were exercises of the right to petition.  And Cuba's notion that the letter to the SMU president is unprotected because there was no live proceeding when the letter was sent is fundamentally unpersuasive:  The letter plainly "pertains to" the proceeding, which is all that is needed under the statute.  Indeed, it was a request to reverse a decision rendered in the proceeding—a request that convinced the president to reverse the decision and reinstate the "charges" against Cuba.  The letter is therefore a protected communication under the TCPA.  Because Cuba concedes the Pylants' position that the vast majority of their statements at issue were exercises of the protected right to petition, and because Cuba's only response fails, the Pylants have satisfied their initial burden under the TCPA.

## C.

The burden shifts to Cuba, whose claims should be dismissed unless he

---

[14] It is uncontroverted that SMU is directly and indirectly supported with public funds.

No. 15-10212
No. 15-10213

can show each essential element by clear and specific evidence in the form of pleadings or affidavits. His claims of malicious prosecution and defamation are pleaded in sufficient detail to survive this step. On the defamation claim, however, the Pylants have established an affirmative defense as to certain of the communications: They are covered by absolute privilege because they occurred during or in contemplation of a judicial proceeding. Cuba's tortious-interference claim does not survive the motion to dismiss: Because he does not specify in any meaningful detail the content of his contract with SMU or what provisions he alleges were violated or impeded by the Pylants' purported interference, he has failed to make out an essential element of that claim.

1.

The elements of malicious prosecution are that (1) a criminal prosecution was commenced against the plaintiff; (2) the defendant initiated or procured that prosecution; (3) the prosecution terminated in the plaintiff's favor; (4) he was innocent of the charges; (5) the defendant lacked probable cause to initiate the prosecution; (6) the defendant acted with malice; and (7) the plaintiff suffered damages. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006). The Pylants maintain that Cuba failed to present sufficient evidence of probable cause, malice, and damages.

The Pylants' theory on probable cause relies on Texas cases that they characterize as establishing a relatively narrow definition of lack of probable cause: "The probable cause element 'asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.'" *Id.* at 792–93 (quoting *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex. 1997)). "Courts must presume that the defendant acted

16

reasonably and had probable cause to initiate criminal proceedings." *Id.*
at 793. And indeed, "[e]ven a failure to fully and fairly disclose all material
information or knowingly providing false information to the prosecutor will not
defeat a complainant's probable cause but are instead relevant to issues of mal-
ice and causation." *Lesher v. Coyel*, 435 S.W.3d 423, 428 (Tex. App.—Dallas
2014, pet. denied). But the complainant must reasonably believe, on the basis
of the facts as he subjectively understands them, that the person accused did
in fact commit the crime. *Id.*

The Pylants misrepresent the nature of Cuba's allegations. Cuba does
not contend that Julia had a good-faith misunderstanding as to the nature of
their sexual encounter and reasonably erred in reporting it as a rape based on
a sincere belief that she had not consented to sex. Cuba instead alleges that
Julia had entirely consensual sex with him, later fabricated "baseless and
knowingly false allegations" of rape, and then knowingly and maliciously
induced the authorities to institute criminal proceedings in which she "falsely
and intentionally testified" that Cuba had raped her. Although we do not pass
on the accuracy of Cuba's accusations at this stage of the litigation, the alle-
gations in his pleadings—which count as "evidence" for purpose of assessing a
TCPA motion to dismiss—are unquestionably sufficient to make out a *prima
facie* case that Julia lacked probable cause. Cuba avers that Julia *subjectively
did not believe that Cuba raped her* but nonetheless accused him. That is pre-
cisely the sort of "lack of probable cause" that is required for a successful
malicious-prosecution action.

The Pylants then urge that Cuba failed to show sufficient evidence of
malice, reasoning that Texas law provides that a finding of malice must be
based on evidence of prior animus or bad relations. Cuba responds that all he

17

had to show was malice under its ordinary legal definition and that he had no obligation to make some special showing of preexisting bad relations.

Cuba has the better of the argument, and his allegations support a determination that he has borne his burden of presenting a clear and specific factual basis. First, the Pylants' assertion that the evidence must show *preexisting* bad relations or animus does not accurately reflect Texas law. Their citation to *Rico v. L-3 Communications Corp.*, 420 S.W.3d 431, 440 (Tex. App.—Dallas 2014, no pet.), does not support the proposition that malice can be shown *only* by evidence of prior bad relations; rather, that is only presented as one way in which malice can be shown. *Id.* *Rico* and the two cases it relies on for the malice requirement contemplate other modes of demonstrating malice.[15] And second, the Pylants admit that factors such as a complainant's lying to the police can go to malice—fatally undercutting their position. Cuba's allegations on this front are fairly specific. He alleges that Julia lied to the police, to the district attorney's office, and on the witness stand before the grand jury and at trial and that she did so knowingly and willfully in each instance. Those allegations are sufficient to satisfy Cuba's burden.

Finally, the Pylants claim that Cuba failed to put on evidence of damages. But that contention turns entirely on the proposition that Cuba was required to prove up damages at this early stage of the case instead of merely providing a clear explanation of the factual basis of the claim. The Pylants' argument is therefore a nonstarter, because Cuba's pleadings describe several specific ways in which the malicious prosecution allegedly injured him. Cuba lists, among other damage, reputational harm, emotional and physical

---

[15] *See Kroger*, 216 S.W.3d at 794–95; *Smith v. Sneed,* 938 S.W.2d 181, 184 (Tex. App.—Austin 1997, no writ).

No. 15-10212
No. 15-10213

distress, inability to continue his education at SMU during the disciplinary proceedings, and costs of defending the criminal action. Those are sufficient for him to bear his burden. Because Cuba has provided clear, specific allegations that exhaustively outline the factual basis of his malicious-prosecution complaint, he has borne his burden on that claim, thereby surviving the motion to dismiss.

2.

A claim for defamation under Texas law has three elements: The defendant (1) published a statement; (2) that was defamatory concerning the defendant; (3) while acting with actual malice (if the plaintiff was a public official or figure) or with negligence (if the plaintiff was a private individual) regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). The Pylants do not challenge the sufficiency of Cuba's allegations or evidentiary proffers. Instead, they aver that they have shown each element of two separate defenses by a preponderance of evidence.[16] They maintain that they have affirmative defenses of limitations and absolute privilege that together bar all of Cuba's claims.

We conclude that the Pylants have established a limitations defense as to the statements Julia made to the SMU disciplinary board in March 2012 but that the Pylants have not met their burden to show that the limitations defense applies to any other defamatory statement. The Pylants have established the defense of absolute privilege as to the statements that they made to police and

---

[16] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d) (West 2013) (stating in relevant part that "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim").

No. 15-10212
No. 15-10213

prosecutorial authorities in the course of the criminal investigation that resulted from Julia's initial police report. But the Pylants have not borne their burden as to the absolute-privilege defense regarding Julia's initial police report and any prior statements. Finally, the Pylants have not met their burden to make out an absolute-privilege defense for any statements to SMU.

First, the Pylants say that all statements made before September 12, 2012, are barred by the one-year statute of limitations on a Texas defamation action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.002. The district court partially considered that position in the context of the Pylants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).[17] It concluded that Julia's statements at the March 2012 disciplinary hearing were barred by limitations but that the Pylants had failed to bear their burden on any other claims.

Because the district court pondered this argument only in a Rule 12(b)(6) posture, it did not consider any materials outside the pleadings. We nonetheless agree with its core conclusion, because the only evidence at issue here— Cuba's affidavit, which the Pylants cite—supports Cuba's position that the discovery rule preserves the majority of his claims. The Pylants' theory is based on the facts that Cuba sued on September 12, 2013, but admitted (in a declaration attached to his opposition to the motion to dismiss) to having learned, on February 14, 2012, of the basic fact that Julia had accused him of raping her. Further, Cuba participated in a March 27, 2012, hearing at which Julia recounted her allegations to SMU authorities.

Cuba invokes the discovery rule,[18] pointing out that, in the same

---

[17] Neither party has appealed the rulings on the Rule 12(b)(6) motions.

[18] *See Newsom v. Brod*, 89 S.W.3d 732, 736 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

No. 15-10212
No. 15-10213

declaration that contains those admissions, he denied having learned of, or having had any opportunity to access, information regarding the Pylants' communications to SMU—the Pylant parents' letter to its president—until April 15, 2013, when he received copies of the communications in discovery in the criminal proceeding. Unless the Pylants' evidence is sufficient to rebut Cuba's invocation of the discovery rule, that rule would toll the running of limitations for the majority of his defamation claims.

The Pylants have adduced no such countervailing evidence. The only thing they point to in support of their limitations theory—Cuba's declaration—indicates that in fact he did not discover the defamatory statements by the Pylants to SMU until April 2013, well within the limitations period for a September 2013 lawsuit. The district court was correct to conclude that the limitations defense protects the statements that Pylant made to the SMU hearing board in March 2012, because Cuba admits to having been present to hear those remarks made. But the Pylants point to no evidence to suggest that Cuba was aware, before September 2012, of any of the other defamatory statements to SMU or the Dallas County authorities—and Cuba affirmatively declared that he was not aware of them. Thus, although the court correctly concluded that the March 2012 statements are barred by limitations, we reject the Pylants' invitation to expand on that finding. The Pylants failed to put on sufficient evidence that Cuba's invocation of the discovery rule was ineffective.

The Pylants also posit that, even if there is no limitations bar, their statements to SMU and police are protected by absolute privilege. That doctrine provides absolute immunity from defamation suits based on testimonial statements made in the course of judicial proceedings (and particular statements preliminary to such proceedings) and to testimonial statements made in

21

No. 15-10212
No. 15-10213

the course of "quasi-judicial" proceedings.  *See Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015).  The Pylants insist that they are entitled to immunity for all statements in this litigation.  The district court, in deciding the Rule 12(b)(6) motion, held that absolute privilege bars liability for any statements that Julia made to the grand jury or at trial, and Cuba did not appeal that holding.

The Pylants advance two sets of arguments for why the district court did not go far enough in adopting their privilege claims.  First, citing *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App.—San Antonio 1997, no writ), they theorize that the Texas cases extend absolute privilege to all statements made "in contemplation of and preliminary to" judicial proceedings.  They say this rule is sufficient to shield all of Julia's communications with the police and district attorney's office.

Cuba responds that reporting a crime to law enforcement receives only the protection of a conditional privilege that is waived if, for example, the accuser acts in malicious bad faith (as Cuba alleges here).  Cuba cites several Texas cases for the proposition that unsolicited communications regarding alleged wrongful acts by an accuser to a law enforcement officer receive only such a conditional privilege.[19]  "Whether an alleged defamatory matter is related to a proposed or existing judicial proceeding is a question of law to be determined by the court.  All doubt should be resolved in favor of the communication's relation to the proceeding."  *Id.*

---

[19] *See Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 437 (Tex. App.—Corpus Christi 1985, no writ); *Zarate v. Cortinas*, 553 S.W.2d 652, 655 (Tex. Civ. App.—Corpus Christi 1977, no writ); *accord Thomas*, 940 S.W.2d at 343 (noting, in the same case that the Pylants cite for their absolute-immunity argument, that accusations of wrongdoing to police get only conditional immunity, and citing *Vista Chevrolet* and *Zarate*).

No. 15-10212
No. 15-10213

Texas law makes a distinction between straightforward reporting of alleged crimes and (once an investigation begins and a judicial proceeding is contemplated) statements made to investigators as a cooperating witness or made in pretrial proceedings. The rule is, therefore, that an initial communication to police regarding alleged wrongdoing receives only a conditional privilege that is waived if the communication was made maliciously to defame or to procure a wrongful prosecution. Once the police or prosecuting authority begins an investigation and solicits further statements, the absolute privilege obtains and shields subsequent statements, even if malicious and false.

The decision in *Shell Oil Co. v. Writt*, 464 S.W.3d 650 (Tex. 2015), as that court's most recent and detailed discussion of the requirements for invoking absolute privilege for pretrial statements, supports this understanding. The facts were as follows:

> Shell . . . received an inquiry from the Department of Justice (DOJ) regarding possible violations of the Foreign Corrupt Practices Act by one of its contractors. Shell met with the DOJ, agreed to perform an internal investigation and report the results to the DOJ, and then did so. Robert Writt, who was employed by Shell until his employment was terminated following the investigation, sued Shell for wrongful termination and for defamation. Writt's defamation claim was based on Shell's furnishing the DOJ its report that contained allegedly defamatory statements about him. Shell asserted that it was absolutely privileged to provide the report to the DOJ and moved for summary judgment.

*Id.* at 651.

Relying on *Vista Chevrolet* and *Zarate*, the court of appeals had held that the statement to DOJ was only conditionally privileged. Shell maintained that its report was absolutely privileged because it was made in the course of an investigation and was actively solicited by DOJ rather than being the sort of unsolicited report of alleged wrongdoing that was at issue in the earlier Texas

23

cases. The Texas Supreme Court agreed. *Id.* at 657. Although the court's reasoning turned to some extent on the fact that Shell was essentially under threat of indictment if it did not cooperate, *id.* at 657, 658–59, that discussion is important primarily as evidence that there was indeed a contemplated judicial proceeding to which the statements to the DOJ pertained. The operative reasoning is that Shell got absolute immunity for its statements to the DOJ because they were made in the course of an ongoing investigation in which Shell was a cooperating witness. That distinguished the case from the *Vista Chevrolet/Zarate* line of cases, in which the courts had determined that unsolicited statements to police or other investigators were not absolutely privileged.

Applying these principles to statements made to police and prosecutors, we conclude that Julia's initial reports are not absolutely privileged, but later statements to police and prosecuting authorities by Julia and her parents, in the course of a *bona fide* investigation in contemplation of filing charges, *are* absolutely privileged. Thus, the Pylants have made out a valid affirmative defense to the defamation claim on the ground of absolute privilege to the extent that those claims turn on statements made in the course of the investigation, despite the fact that the defense does not apply to Julia's initial contact with police. That initial contact enjoys only conditional immunity, which does not suffice to support dismissal in the face of detailed allegations of knowing and malicious fabrication of defamatory accusations.

The Pylants next urge that all of their statements to SMU are absolutely privileged because the SMU process was "quasi-judicial" and therefore subject to the privilege rules that obtain for the police investigation and criminal proceeding. The Pylants cite a bevy of cases[20] for the proposition that quasi-

---

[20] *See Senior Care Res., Inc. v. OAC Senior Living, LLC*, 442 S.W.3d 504, 518 (Tex.

No. 15-10212
No. 15-10213

judicial proceedings are subject to an absolute privilege for testimonial statements made therein.

But none of those cases establishes immunity for a statement in a "quasi-judicial" proceeding *in a private institution that does not have any law enforcement or law interpreting authority*.  Those decisions are limited to statements made in governmental administrative procedures that bear the trappings of adversarial litigation.[21]

The Pylants argue that the SMU procedures were quasi-judicial, within the meaning of that term in the immunity context, because they involved a board with the power to investigate and redress grievances.  But nowhere do the Pylants cite authority for the proposition that a private institution's "adjudication" of a dispute invokes immunity.  Their statements to SMU are not shielded by absolute privilege.

3.

The elements of tortious interference with contract are (1) a contract subject to interference; (2) a willful and intentional act of interference (3) that was a proximate cause of the plaintiff's damages; and (4) actual damage.  *Texas*

---

App.—Dallas 2014, no pet.); *Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson, & Meeks, LLP*, 291 S.W.3d 448, 451 (Tex. App.—Fort Worth 2009, no pet.); *Hernandez v. Hayes*, 931 S.W.2d 648, 649 (Tex. App.—San Antonio 1996, writ denied); *Gallegos v. Escalon*, 993 S.W.2d 442, 426 (Tex. App.—Corpus Christi 1999, no pet.); *Lane v. Port Terminal R.R. Ass'n*, 821 S.W.2d 623, 625 (Tex. App.—Houston [14th Dist.] 1991, writ denied).

[21] *See Senior Care*, 442 S.W.3d at 508–09 (procedures in the Texas Department of Aging and Disability Services for increasing reimbursable Medicaid allocations); *Perdue*, 291 S.W.2d at 450–51 (dispute on city council between tax-collection firms during deliberations for awarding contract); *Hernandez*, 931 S.W.2d at 649 (public school board's grievance-process hearing); *Gallegos*, 993 S.W.2d at 423–24 (school board meeting to investigate use of district's credit card); *Lane*, 821 S.W.2d at 624 (proceeding before board of adjustment under federal railway labor statute).

*Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). "For a plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied). Although it does not appear that an actual breach must occur, the defendant must have intended to induce a breach (even if unsuccessful), thereby making performance more difficult in some way that injured the plaintiff. *See Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 443 (Tex. App.—Beaumont 2008, pet. denied).

The Pylants assert that Cuba failed to identify evidence regarding (1) any provision of his contract with SMU that they induced SMU to breach; (2) any causal connection between the Pylants' statements and the purported breach; and (3) any cognizable damage. The Pylants maintain that Cuba's failure to identify any particular provision with which they interfered is fatal. They correctly point out that Cuba does not show or allege that SMU took actions inconsistent with its contractual duties. And indeed, Cuba affirmatively alleged that he withdrew from SMU for medical reasons. The Pylants further urge that, to the extent that Cuba did not identify any breached provision, their statements could not have been the cause of the breach (which did not occur, they suggest) and that therefore there could be no legally traceable damages. *See id.*

Cuba responds that he alleged the existence of a contract with SMU to confer a degree in exchange for tuition and completion of coursework. He also claimed that the Pylants' statements were designed to cause SMU to expel him, thus interfering with that contract. He further posits that despite the fact that, although *one* proximate cause of his departure was his medical condition, the

Pylants' interference was an additional proximate cause.

The Pylants have the better of the argument for the plain reason that Cuba does not provide any "clear and specific" description, evidence, or allegations regarding the details of the allegedly interfered-with contract. Without such details, it is impossible to indulge a reasonable inference that the Pylants' statements had any interfering effect on the contract. Cuba's bare allegation that he had a contract that was in some sense impeded by the Pylants' actions is not sufficient to bear his burden to provide a highly detailed and specific account (or evidence allowing the court to flesh out a highly specific account) of the alleged interference.

It is not evident from Cuba's pleadings or brief which, if any, provisions of the purported contract the Pylants intended to induce SMU to breach. For example, it is not clear which, if any, obligations SMU had if it reasonably believed that Cuba might have committed a crime or violated student-conduct rules. The reason why that is not obvious is that Cuba points to no evidence of the school's obligations. Absent such evidence or specific pleadings, Cuba has not borne his burden, under the TCPA, to make out a *prima facie* case for each element of his claim.

## IV.

For the foregoing reasons, on remand the Pylants' TCPA motions to dismiss should be granted in part and denied in part. We VACATE the orders from which these interlocutory appeals are taken, and we REMAND for further proceedings as needed. We place no limit on the matters that the district court may address or decide on remand, and we give no indication of how it should rule.

No. 15-10212
No. 15-10213

JAMES E. GRAVES, JR., Circuit Judge, dissenting.

The majority opinion, like others before it, assumes that the Texas Citizen Participation Act (TCPA) "do[es] in fact apply in federal court." *See, e.g.*, *Culbertson v. Lykos*, 790 F.3d 608, 631 (5th Cir. 2015) ("We have not specifically held that the TCPA applies in federal court; at most we have assumed without deciding its applicability."). But, since the panel is applying the TCPA to Cuba's claims, we should begin by invoking *Erie* to determine whether we have the authority to do so. Because I conclude that the TCPA is not applicable in federal court, I respectfully dissent.[1]

I.

Federal courts sitting in diversity apply state substantive law rather than federal common law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In other words, federal courts apply state common law but federal procedural rules. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1995); *Hanna v. Plumer*, 380 U.S. 460, 468 (1965); *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008).

We apply a multi-step inquiry when performing an *Erie* analysis. *Hanna,* 380 U.S. at 461-62. First, it must be determined whether the statute is procedural or substantive. State procedural statutes may not be applied in federal courts. *Erie,* 304 U.S. at 78. State substantive rules must be applied, but before doing so, we move to the second step to decide whether the state law

---

[1] Our sister circuits that have considered this issue have split, with some deciding that federal courts may apply Anti-SLAPP statutes, *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010); *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999), and others deciding that we may not, *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 272 (9th Cir. 2013) (Kozinski, J. concurring) (calling into question the Ninth Circuit's holding in *Newsham*).

No. 15-10212
No. 15-10213

conflicts with federal procedural rules; if so, then the federal rule applies. *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011). If, however, the rule does not conflict with federal procedural rules, then we "wade into the murky waters of *Erie* itself" and determine whether application of the statute serves *Erie's* twin aims of "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.* at 333-36. In short, "we should not apply a state law or rule if (1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).

## II.

Applying an *Erie* analysis, I conclude that the TCPA is procedural and must be ignored. The TCPA is codified in the Texas Civil Practice and Remedies Code, provides for a pre-trial motion to dismiss claims subject to its coverage, establishes time limits for consideration of such motions to dismiss, grants a right to appeal a denial of the motion, and authorizes the award of attorneys' fees if a claim is dismissed. This creates no substantive rule of Texas law; rather, the TCPA is clearly a procedural mechanism for speedy dismissal of a meritless lawsuit that infringes on certain constitutional protections. *See, e.g., Abbas*, 783 F.3d at 1333. Because the TCPA is procedural, I would follow *Erie's* command and apply the federal rules.

## III.

## A.

Assuming, however, that the TCPA is substantive, then it still must yield to federal law because it directly conflicts with the Federal Rules of Civil

29

No. 15-10212
No. 15-10213

Procedure. To survive a TCPA motion to dismiss, plaintiffs must provide "clear and specific evidence" for each element of a prima facie case. TEX. CIV. PRAC. & REM. CODE § 27.005(c). This mandate requires evidence that is "unambiguous, sure, or free from doubt," "explicit or relating to a particular named thing," and that "support[s] a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). This may be done through examination of the pleadings, supporting and opposing affidavits, and if granted by motion, limited discovery. TEX. CIV. PRAC. & REM. CODE § 27.006. Although there is no precise definition of clear and specific evidence, the Texas Supreme Court has made clear that it lies somewhere between Texas's pleading standard and the evidentiary standard necessary to prevail at trial. *In re Lipsky*, 460 S.W. 2d at 591.

This obviously conflicts with Rule 12. To overcome a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts sufficient to state a claim that is plausible on its face. *Lexington Ins. Co. v. S.H.R.M. Catering Servs., Inc.*, 567 F.3d 182, 184 (5th Cir. 2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is *improbable*, and that a recovery is very *remote and unlikely*." *Leal v. McHugh*, 731 F.3d 405, 413 (5th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (emphasis added). This is a clear conflict with the TCPA's requirement that the evidence be "unambiguous, sure, or free from doubt." Additionally, courts need not, when applying Rule 12, determine if the evidence supports a rational inference that the allegations are true. Instead, courts must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). Most importantly, Rule 12 assesses the sufficiency of a claim prior to discovery. Yet, the TCPA

No. 15-10212
No. 15-10213

allows for "specified and limited discovery relevant to the motion." TEX. CIV. PRAC. & REM. CODE § 27.006.

The TCPA similarly conflicts with Rule 56. Rule 56 permits summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The TCPA, however, requires more than a determination that there are no disputed facts that would allow the court to decide the claims as a matter of law; it requires evidence showing the allegations are in fact true. Moreover, Rule 56 places the initial burden on the moving party and then shifts the burden to the nonmoving party to show that there is a dispute that merits trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 484 (5th Cir. 2014). In contrast, the TCPA does not require the moving party to proffer reasons why the claims should be dismissed. Instead, it requires the moving party to show that the plaintiff's claims arise from the defendant's exercise of a protected right within the statute's coverage, after which the burden is placed on the non-moving party to show that their claims should proceed. TEX. CIV. PRAC. & REM. CODE § 27.005(b).

There is no doubt that the TCPA directly conflicts with the "integrated program of pre-trial . . . [federal] procedures designed to ensure the just, speedy, and inexpensive determination of every action and proceeding." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, C.J. concurring) (internal quotations and citations omitted). Therefore, the TCPA may not be applied as long as Rules 12 and 56 do not violate the Rules Enabling Act.

No. 15-10212
No. 15-10213

B.

The Rules Enabling Act authorized the Supreme Court "to promulgate rules of procedure subject to its review, but with the limitation that those rules shall not abridge, enlarge or modify any substantive right." *Shady Grove*, 559 U.S. at 407 (internal quotations and citations omitted) (plurality opinion of Scalia, J.). To be valid, these rules must truly regulate "'the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'" *Id.* (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)). Therefore, a federal procedural rule is lawful as long as it governs the process by which substantive rights are enforced. *Id.*

There is no doubt that Rules 12 and 56 are properly promulgated under the Rules Enabling Act. Both rules present mechanisms for dismissing claims prior to trial. I see no reason to depart from the sound conclusions of every federal court that has considered this question and determined that Rules 12 and 56 are valid procedural rules. *See, e.g., Shady Grove*, 559 U.S. at 404; *Abbas*, 783 F.3d at 1337.

IV.

In sum, the TCPA is procedural and we may not apply it when sitting in diversity. Even if, however, it could be said that the TCPA is substantive, then there is no doubt that it must yield to the Federal Rules of Civil Procedure because it directly conflicts with the pre-trial dismissal mechanisms of Rules 12 and 56.

I respectfully dissent.